## FORD MOTOR CO. v. PEARSON. *
### No. 5882.

Circuit Court of Appeals, Ninth Circuit.
May 5, 1930.

*Rehearing denied August 26, 1930.

Peters, Powell, Evans & McLaren, William A. Peters, John H. Powell, Robert H. Evans, and William G. McLaren, all of Seattle, Wash., for appellant.

Arthur C. Dresbach, Arthur E. Griffin, and J. Speed Smith, all of Seattle, Wash., for appellee.

Before DIETRICH and WILBUR, Circuit Judges, and LOUDERBACK, District Judge.

WILBUR, Circuit Judge.

On December 5, 1916, a building contract was entered into between Alexander Pearson, the appellee, who will hereinafter be referred to as the contractor, with the appellant, Ford Motor Company, who will hereinafter be referred to as the owner. This contract provided for the erection of a building upon land of the owner in Des Moines, Iowa. The building was to be completed in August, 1917, at the contract price of $397,000. In addition, the owner furnished certain material to the builder, so that the total estimated cost of the building was about $500,000. The builder proceeded with the construction of the building in accordance with the contract until about 96 per cent. complete, when, on April 23, 1918, he entered into an arrangement with the owner, the terms of which are in dispute, for the completion of the building. About six months after the completion of the building by the owner, the contractor brought this action against the owner, and recovered a judgment for $25,000, with 6 per cent. interest thereon, aggregating about $41,000. The complaint alleges the execution of the contract in question, the performance of a part of that contract by the contractor, completion of the building by the owner, and payment by the owner to the contractor of a portion of the contract price shown by the bill of particulars to be $384,450.38.

The contractor alleges that, at the time he was negotiating with the owner for the purpose of entering into such contract, the owner furnished him with maps and descriptions of purported borings of test holes in the soil

of the site upon which the building was to be erected, purporting to show the foundation material. He alleges that the results of the borings furnished to him were to the effect that no sand would be encountered in the foundations for footings and piers. He alleges that said representations and maps were untrue, erroneous, and misleading, in that sand did exist in such footings, that the plaintiff acted upon such representations in entering into the contract, and that, when he undertook to erect the building and made the necessary excavation for the footings for the piers supporting the building, he found the conditions of the soil to be such that a large additional expenditure on his part was necessary. These maps and descriptions of the borings were a part of the plans. They were signed by the contractor and made a part of the contract. The conditions shown by the borings were indicated by a key on the plan. According to the key, "clay and quicksand" was indicated by cross-hatching at an angle of forty-five degrees, with the vertical extending from right side of the boring downward to left, with dots, while "light gray sand clay" was indicated by cross-hatching at an angle of forty-five degrees, with the vertical extending downward from left side of the boring to right, spaced about half as far apart as in the case of "quicksand and clay," also with dots. Sand was indicated by dots alone, and fine sand by dots more widely dispersed. Borings 8 and 9 on the plans introduced in evidence, according to the key, showed quicksand and clay. The architect, Louis Kahn, testified with relation thereto as follows:

"Thirty-two borings are shown. The borings show the general nature of the soil. The borings indicate a very poor soil generally. Generally gumbo towards the upper part, gumbo being a very unstable and slippery material. Below the gumbo in almost all cases is shown sand, varying in texture from fine to coarse, and in most cases sand in water, which would indicate the presence of quicksand in practically every boring. This information was furnished to the Pearson Construction Company prior to their bid. The specifications make particular reference to borings 8 and 9. This occurs in paragraph No. 101, page 114, of the specifications. The contractor was notified by this paragraph that unit prices covering changes in footings is to be based on the assumption that soil conditions as indicated in borings 8 and 9 would be encountered. We called attention to borings 8 and 9 as we wished to give the contractor notice that the soil he might expect was of a very poor nature. Borings 8 and 9 showed that quicksand would be encountered. The contractor was notified in advance to submit unit prices large enough to take care of doing work in quicksand."

The specification referred to is as follows:

"In all cases excavate sufficiently so that no work rests on poor soil. Where necessary to go down lower than shown on the plans, an additional allowance will be made the contractor in accordance with unit prices agreed upon.

"The unit prices will be held to govern conditions found similar to that shown by borings 8 and 9, where extending to greater depth than the schedule footings depths. Should a condition as shown by the above mentioned boring be found in excavating above the indicated footing depths, all work necessary to properly care for such conditions shall be performed as a part of the work under this specification."

The contractor, on cross-examination, testified that borings 8 and 9 "do not show quicksand, but fine sand, that is all," but he also testified, "It is marked so close between clay and 'clay and quicksand,' 'blue clay and light gray sand,' that it is awfully hard to distinguish." It is true that on a cursory examination of the plans one might overlook the difference in the markings, but the plans are plainly marked, and attention is especially called thereto by the specifications.

The contractor has been paid $21,000 under estimates for additional work on footings due under the terms of the contract and specifications because of soil conditions at the footings. He claims in this action, in addition thereto, a large amount as damages for the delay engendered by such soil conditions, which made the work more expensive by reason of the fact that the ground thawed out, and that later on the work on the building was subjected to war conditions.

The contractor alleged that he was subjected to additional expense and delay by reason of the fact that the owner did not furnish him the lines of the lot upon which the building was to be erected, as required by the contract, and that because of this delay he was subjected to additional expense. He alleges that he was subjected to additional expense and delay in the erection of the building because of the failure of the owner to cause the city of Des Moines to repair the storm sewer crossing the site. He alleges that he was further delayed by the failure of the owner to furnish an architect at Des Moines for supervision of the construction, and by

reason of the fact that the architect who did supervise the work was in Detroit. He alleges that he would have made a profit of $48,000 if the defendant had performed the contract on its part, "but that by the defendant breaching the said contract as hereinbefore specified plaintiff was prevented and delayed from performing it." He alleges that he paid out $89,457.63 in excess of payments made to him, "and in excess of credits to which the defendant is entitled." He alleges that he had obligated himself to pay $90,298.02 more, and alleges "that the defendant took over, under the terms of the contract, and general conditions made a part thereof," tools and equipment worth $19,785, and has refused to redeliver the same. He further alleges and prays for judgment as follows:

"* * * That by defendant breaching the contract as hereinbefore specified, plaintiff has been damaged by the loss of the profits he would have made and earned in the said sum of $48,000.00 and by the amount he has necessarily paid out for labor and material entering into and for the construction of said building over and above all credits in the said sum of $89,457.63; that by said amount this plaintiff has obligated himself to pay for labor and materials which entered into said building in said sum of $90,208.02, and by the taking and appropriating to its own use of plaintiff's tools, appliances and equipment in the sum of $19,785.00, amounting in all to the sum of $247,540.65, together with interest thereon from and including the first day of May, 1918.

"Wherefore, plaintiff demands judgment against defendant for said sum of $247,540.65, together with interest," etc.

It will thus be seen that the contractor relies upon certain alleged breaches of the contract by the owner and upon damages resulting to him from misstatements in the plans concerning the character of the subsoil conditions, and upon damages due to a conversion of certain personal property which the owner used in completion of the building and refused to return.

The owner pleads settlement and release effected on the 23d of April, 1918, as evidenced by a written agreement, in the form of a letter, signed by the contractor at that time, and accepted by a letter in reply. The agreement is set out in hæc verba in the answer. To this answer the contractor files a reply to the effect that this release was obtained by "gross fraud," although the facts constituting the fraud are not distinctly or clearly alleged. The reply does not specify or allege fraud by trick or device concerning

the execution of the agreement or in inserting a release clause therein. The nearest approach to such an allegation is the following:

"That plaintiff has not received an education in the English language and did not understand the said agreement except as represented to him, and did not agree to waive his claim for any sum or sums then due him from defendant, and denies that he accepted the completion of the building for the consideration of waiving the large sums due him or any sums whatever, and that any expression to the contrary was not the agreement thereof."

As the agreement of April 23, 1918, affects the rights of both parties, we will first consider the effect of that instrument under the proof and the instructions.

The proof relied upon by the contractor and the issue submitted to the jury thereon was as to whether or not there was fraudulent substitution of documents when the contractor signed the instrument of April 23, 1918, so that the document signed by him incorporated a release clause which was not contained in the document which he intended to sign and believed he was signing. As it is conceded that, if the release clause in the document signed by the contractor is not void because of fraud, the contractor is not entitled to judgment, we will first consider that question.

The contractor was a man of large experience, and had been in the building business for about thirty-five years, and had already completed a large assembly plant for the owner at Portland. It is uncontroverted that on April 23, 1918, an agreement was effected between the parties by which the owner took possession of the premises and completed the building and paid the costs therefor, amounting to about $100,000 in excess of the balance due to the contractor. It is admitted that a written agreement providing for this change by which the owner took over and completed the building was entered into by the parties. The contractor's claim is that a release clause was inserted therein without his knowledge or consent. He claims that this release clause was inserted therein in the process of reframing the letter of April 17, which it was intended to replace. He claims that he signed the letter believing that such clause was not therein because it was expressly represented to him at that time that the letter he was signing was the letter dated April 17, 1918, which he had just delivered to the owner's agent, Knudsen, to be "put in legal form." The clause in controversy is as follows:

"In further consideration of your compliance with this request I agree to relinquish to you all my rights under the contract, take the loss already incurred by me, release and cancel all claims for profit, extras or further payments under the contract or arising from the job."

Assuming that the contractor's claim and testimony is true, the agreement entered into between the parties under which the owner took possession and completed the building was that contained in the letter which the contractor believed he was signing, and which according to his testimony the owner knew he believed he was signing. If we put aside the question of whether extrinsic as well as intrinsic fraud can be interposed as a defense to a release in an action at law, it is clear at any rate that, where the document involved is not only a release, but also purports to settle and adjust the rights and obligations of the parties as to the completion of a building under construction, as is the case here, the utmost advantage that the contractor can take of intrinsic fraud as to the actual words used in the contract, after the other party has gone forward in full reliance thereon and has completed the building, is a reformation of the new contract under which the building was completed to conform to the actual agreement between the parties. If the agreement of April 23, 1918, had been a release and nothing else, and if, as claimed, the signature thereto had been obtained by a fraudulent substitution of instruments, it might be treated as void in an action at law. Here, however, there was actual assent to a contract under which the owner has expended nearly $150,000 and nearly $100,000 over and above the contract price of the building, augmented by extra costs and expenses agreed upon as additions to the contract.

The agreement which the contractor testifies he believed he was signing is a draft of a letter of April 17, 1918, as follows:

"Pearson Construction Company.

"Detroit, Mich., April 17, 1918.
"Ford Motor Company, Detroit, Michigan.

"Gentlemen: I am forced to call upon the Ford Motor Company to furnish funds in excess of the contract stipulation contained in agreement between us in order that your Des Moines building may be completed.

"It is my belief that in excess of the $42,-000 now due on the contract there will be required approximately $40,000 or more to finish the work. As I have previously put in somewhat in the neighborhood of $90,000 more than I have received, due to foundation trouble and war conditions of the labor and material market, I feel justified in requesting the Ford Motor Company to carry any further loss which certainly will be entailed if the work is to be completed.

"In consideration of your complying with my request in taking over and completing the job, I am willing to turn over to you any and all material, equipment and organization now on the site or ordered for the job, and I agree to assign to you all of my interest in and to the material and property ordered or purchased by me for the job and to turn over to you all accounts, bills, books and contracts pertaining to the work, with the understanding that all material, property and equipment not needed for the building shall revert to me. I agree further to furnish you with a sworn statement of all claims, lienable or otherwise, accounts and bills not only those now due and owing but also those that will be contracted by us and become due in finishing the building. In further consideration of your compliance with this request I agree that all claims for profit, extras or further payments under the contract or arising from the job shall be deferred for consideration after completion of the building.

"Should I not receive the assistance asked for I shall be unable to maintain my organization on the job nor will I be able to meet at this time all bills due for material and labor. In bringing the matter before you I wish to point out that certain extra work and special conditions due to the war are entirely responsible for my inability to finish the job and complete my contract with you, forcing me in this manner to call upon you to do it for me. I can refer you to the successful completion of my previous contracts with you as proof that I have spared no efforts in my attempt to live up to the present contract and that my inability to do so is not my fault. I further wish to point out that the quality of my work on the Des Moines building is not questioned by the people you have in charge there; and I hope that when business conditions warrant I may have another chance to demonstrate my ability as a builder.

"Yours very truly,
"Pearson Construction Co.,
"By ————."

It should be observed that the contractor therein states that he is forced to call upon the owner to furnish funds in excess of the contract stipulation in order that the building may be completed, that it would cost $40,-000 in excess of the balance due on the contract to complete the contract, and that the contractor has already expended $90,000 in excess of the amount received. For this reason the contractor therein states that he feels

justified in requesting the owner "to carry any further loss which certainly will be entailed if the work is to be completed." There is no claim in this letter that the foundation trouble resulted from fraud or misrepresentation on the part of the owner, and no claim in the letter that the war conditions of the labor and material market, so far as they bore upon the rights of the parties, resulted from any default or fraud on the part of the owner. There is no claim therein that the owner has been guilty of a breach of the contract. In this letter the contract is recognized as still in effect, binding the parties and measuring their respective obligations. He also states that, if he does not receive the assistance asked, that is, funds in excess of the contract stipulation, he will be unable to meet his bills due, that his inability to finish the job, and to complete the contract, without such assistance, is due to certain extra work and special conditions due to the war, which have forced him to call upon the owner to complete the work "for me." In this agreement, instead of the release clause which the contractor claims was fraudulently substituted, is the following clause:

"In further consideration of your compliance with this request I agree that all claims for profit, extras or further payments under the contract or arising from the job shall be deferred for consideration after completion of the building."

These rights were necessarily to be determined by the contract. This seems to be the view of the contractor, for, in his reply herein to the agreement and release, he pleads and sets out in hæc verba a clause of the contract which permitted the owner to terminate the employment of a contractor, and, as we understand, it alleges that the completion of the building was under this clause as modified by the agreement of April 23d. It is unnecessary to further consider at this time the rights of the parties growing out of the agreement of April 23d as the contractor claims it to be in his testimony or in his pleadings, for the reason that such agreement was entirely ignored by the jury.

The court instructed the jury that, if they found from the evidence that the agreement of release was obtained fraudulently, they could disregard the release and consider the rights of the parties growing out of the original building contract and the fraud, if any, in its inception, relating to the borings, and instructed the jury that the contractor could elect, and had elected, to treat the contract as rescinded because of the fraud relating to the borings in its inception, or the breaches

thereof by the owner. This feature of the instruction is as follows:

"After a time the parties entered into negotiations for an adjustment which eventually culminated in the letter signed by the plaintiff which has been termed a 'release' in the testimony and which plaintiff repudiates and now claims was the result of fraud practiced upon him by the defendant and upon such repudiation he has elected to rescind the contract—that is, declare it at an end because of those defaults upon the part of the defendant, which he asserts and of which he had theretofore had knowledge during a part of the time he was proceeding with his work of construction under the contract. This he may do, and sue for the money paid out by him upon the construction in excess of that which the defendant has paid him and also sue for his lost profits, providing he did so within a reasonable time after learning of the defaults of the defendant in the performance of the contract and before the defendant had acted to its prejudice in justifiable reliance upon plaintiff's having waived defendant's default or defaults in its performance of the contract and that plaintiff would, despite such defaults, continue the construction under the contract."

This instruction was clearly erroneous. Deferring for a moment the question of fraud with reference to the borings, the subsequent dealings of the parties, wherein the contractor continued under the contract to construct the building, and to demand and accept payment therefor after full knowledge of the actual subsoil conditions, was an election to be bound by the contract, and he could not, after the completion thereof by the owner, rescind the contract because of such fraud. Burk v. Johnson et al. (C. C. A. 8) 146 F. 209, 218; Grymes v. Sanders, 93 U. S. 55, 23 L. Ed. 798; McLean v. Clapp, 141 U. S. 449, 12 S. Ct. 29, 35 L. Ed. 804; Black, Rescission and Cancellation (2d Ed.) § 594. The same is true as to the alleged breaches of the contract by the owner. The contractor's request that the owner take over the completion of the building for him was an election to be bound by the contract, and, after the owner had accepted said proposal and had acted thereon by expending large sums of money on the faith of such request, the contractor could not rescind or abrogate the contract for a breach thereof or for fraud in the inception thereof theretofore discovered, but at most must rely on his claims for damages. Lee v. McClelland, 120 Cal. 147, 52 P. 300; Brown et al. v. South Joplin Lead & Zinc Mining Co., 231 Mo. 166, 132 S. W. 693, 140 Am. St. Rep. 509; Ott v. Pace, 43 Mont. 82, 115 P.

37; Page on Contracts (2d Ed.) § 354. Whether the contractor's conduct before the agreement of April 23, 1918, also waived his claim for damages for fraud in procuring the contract we need not at present determine. See Schmidt v. Mesner, 116 Cal. 267, 48 P. 54. This instruction, as we have said, completely ignores the admitted fact that on April 23d an agreement was entered into between the parties, the terms of which are in dispute, adjusting their rights under the contract, which agreement it is admitted assumed the building contract to be still in full force and effect, and, at most, conceding plaintiff's contention as to its terms, postponing the final determination of the rights of the parties until after the completion of the building by the owner, who, according to the admitted terms of the new agreement, was to expend between thirty-five and forty thousand dollars in excess of the balance due the contractor, and who has, in fact, expended nearly $60,000 more than was so anticipated. The trial court also elaborately instructed the jury with reference to the right of the contractor to rescind the original contract because of the alleged misstatements concerning the trial borings, thus leaving the jury to determine whether or not the rescission alleged to have been attempted or effected by the contractor was within a reasonable time after discovery of the alleged falsity of the representations as to such borings, and also leaving to the determination of the jury the question of whether or not the various alleged breaches of the contract by the owner had been taken advantage of by the contractor by rescission within a reasonable time after the breach of the alleged contract. As already pointed out, this alleged fraud and these breaches were waived in so far as they constituted a basis for rescission of the building contract. The contractor's complaint, however, was not based upon a rescission of the original contract nor upon a rescission of the contract of release. It was a complaint for damages for alleged breaches, by the owner, of certain agreements contained in the building contract, coupled with a claim for damages by reason of statements of the owner, alleged to be untrue, concerning subsoil conditions, and another claim for conversion of the personal property taken charge of by the owner at the time he took over the completion of the contract under the new agreement therefor. The contractor, in his brief, admits that the use of the word "rescission" by the trial court in the instructions to the jury was erroneous. There was no rescission. He now claims, however, that the jury were correctly instructed as to the measure of damages, and that the real controversy adjudicated by the court and jury was as to the damage resulting to the contractor from a prevention of performance of the contract, by the owner.

■ In this connection it should be stated that there is no direct allegation in the complaint that there was a prevention of performance, the allegation which we have quoted above being to the effect that "by the breaches and delays the contractor was prevented," etc. This recital is not a sufficient allegation of prevention of performance to support a judgment therefor. There is a distinction between ordinary breaches of a contract and those which amount to a prevention of performance. See Page on Contracts (2d Ed) § 2918 et seq. It is clear that the contractor was not prevented from performing the contract. The only prevention of performance asserted in the brief on appeal is the failure to pay $10,600 which the contractor claims was due on the 16th of April, 1918. There is no allegation in the complaint that the contractor was prevented from performing the contract by the failure of the owner to make any payment due to him under the contract. On the other hand, it is alleged in the complaint that the owner took possession of the building material "under the contract" to complete the building, and the letter of April 17th by its admitted terms concedes that the money then required by the contractor in order to enable him to proceed with the work was in excess of the amount then due him under the contract. It is too late to claim on appeal that there was a prevention of performance due to the nonpayment of money due under the contract, and such claim seems to be in direct contradiction of the agreement which the contractor admits he intended to sign and which he did in fact sign.

■ We will now consider whether or not there was such clear and convincing evidence of fraud in the execution of the agreement of April 23, 1918, as justified the conclusion that the contractor was not bound by its terms. It is conceded that, if the release clause in the letter of April 23, 1918, is binding upon the contractor, his action fails. The owner moved for a directed verdict, but his motion was denied, and the jury, under the instructions of the court, held that the release was not binding on the contractor. It is conceded, and the court instructed the jury, that the evidence which would justify such a finding must be "clear and convincing." In determining whether this question was properly submitted to the jury, an appellate court in the case of a disagreement between the testimony of witnesses, where the case is

properly one for the consideration of a jury to be determined by their judgment as to the truth or falsity of the testimony, must assume that they disbelieved the witnesses whose testimony conflicts with their conclusion, and believed the witnesses whose testimony would support the verdict. With this rule in mind we will examine the testimony of the contractor, but, before doing so, it is well to state that the other witnesses to the transaction testify positively and definitely that the release clause contained in the letter of April 23, 1918, was fully discussed and agreed to, and that the letter as signed by the contractor correctly expressed the agreement which had theretofore been reached. If their testimony had been believed by the jury, their verdict would necessarily have been for the owner, under the instruction of the court.

We will now consider the testimony of the contractor, the plaintiff, for the purpose of determining whether or not he had shown by clear and convincing evidence that he was tricked or deceived into signing a document other than that which he supposed he was signing.

The contractor testified that he went to Detroit, Mich., on the 13th of April, 1918, to see the owner; that he went there because he could not get his estimate through, and wanted to find out what was the matter. He said: "I saw Mr. Albert Kahn first." Albert Kahn was the architect. "I told him I must have money, otherwise I could not continue with the building. He would not let me have the money. I then went to Knudsen." Knudsen was the representative of the owner in the matter of the building. "Knudsen told me his hands were tied, but he promised to see the architect to see if he could get the estimate through. I saw Mr. Knudsen later. I saw him again on the 17th of April, 1918. Before going to him I went to the bonding company's attorneys and also my attorney, for advice as to what to do. My attorney wrote a demand on the Ford Motor Company for money due me. This was dated the 16th of April, 1918." This letter is as follows:

"Pearson Construction Company.

"Building and Engineering Construction.

"Detroit, Mich. April 16, 1918.

"Ford Motor Co., Detroit, Mich.

"Gentlemen: Re: Ford Service Building, Des Moines, Iowa. On November 14th, 1917, we presented our statement representing a portion of the extra bills to that date which we were compelled to pay out in complying with your order of May 2, 1917, to proceed with re-piling and re-excavating footings at your expense. You paid a portion of this bill but there is still a balance of $31,314.18, which has never been paid us.

"The balance does not begin to represent the actual loss we have suffered, because of this extra work. Nor would it be correct to say that our loss was due entirely to the war, because the heaviest part of our loss was not due directly to the war, but the fact that the extra work prevented us from pushing the building through to completion at a time when we could have done so at about half the cost we can now.

"In other words, the actual cost of re-excavating and re-building piers, was only a very small part of our loss. We were not only actually held back during the four summer months, but the extra work prevented us from finishing the building before the cold weather, which added another four months or more at a time when every day that passed seemed to bring an increase in the cost of labor and material.

"Therefore you can readily see that it is impossible for us to estimate anything like our real loss. We can only give you the figures which our books and contract show. These are approximately as follows:

| | | |
|---|---|---|
| Original contract for excavation | 16,000 | |
| Actual cost of excavation | 150,000 | $134,000 |
| Net loss on excavation | $134,000 | |
| Original contract for lumber | 33,000 | |
| Actual cost of lumber | 48,000 | |
| Net loss on lumber | | 15,000 |
| | | $149,000 |
| Original rate of wage for common labor, 25¢ per hr. | | |
| Actual rate of wage for common labor, 40¢ per hr. | | |
| Original rate of wage for skilled mechanics, 45¢ per hr. | | |
| Actual rate of wage for skilled mechanics, 70¢ per hr. | | |
| Net loss on labor | | 35,000 |
| Estimated increase in cost of material other than lumber, sand and gravel, | | 10,000 |
| | | $212,000 |
| By Cash, | | 23,000 |
| | | $189,000 |

"In normal times this delay would not have worked a serious hardship, but any delay in war time means almost ruination. This has been very generally recognized throughout the country and as you know, many owners and many State Governments have followed the example of the United States Government and in all of their contracts have voluntarily come to the rescue of their contractors and made allowance for the extra cost of labor and material necessitated by war conditions.

"In requesting an allowance for these losses we feel that we are not making an unreasonable request but are only asking you to do for us what the United States Government is doing on all of its contracts.

"Yours very truly,
"Pearson Construction Co.,
"By —————."

"This letter was written by my attorney, who was also attorney for the bonding company, * * * Mr. Knudsen had this letter before him when I saw him on the 17th of April. I said I believed I was entitled to the money and I wanted it. He asked me if I would go ahead and complete the contract. No, I said I can't complete the contract until I get paid. I have to have money to complete it with. He referred to the clause in the specifications that they have a right to take over the contract if I can't go ahead with it. I said that I thought it would be unfair to do such a thing, that I didn't like that method. I have been in business now for many years and it never happened to me before and I do not like to see it happen now. Then he said to write him a letter and see if we couldn't agree on something. I told Mr. Knudsen I was not used to letter writing. I did not know exactly what we would agree upon. I asked him if he wouldn't be kind enough to sit down and write a letter for me, which he did. Kahn [the architect] was mentioned in this conversation. He bucked the payments, and Knudsen thought it was wise to fix up something so that we could complete the building and then get rid of Kahn so Kahn wouldn't interfere, and when we got through we could get together and make the settlement * * * He wrote out the letter with a pencil on the table and then went out to get it typewritten and he came back after a little while and gave me the original and a copy and asked me to look it over and I began to read it a little, but I wasn't so sharp in to understand the meanings of it, so I asked for permission to get a chance to see the bonding company."

Plaintiff then testified that he showed the letter to his attorney, and that the attorney drew a reply thereto dated April 19th. This letter is as follows:

"Pearson Construction Company.

"Detroit, Mich., April 19, 1918.
"Ford Motor Company, Detroit, Michigan.

"Gentlemen: I have wired Seattle, Des Moines and Chicago and have very carefully considered the answers to these wires, and I am convinced that I would not be justified in signing the letter presented by you on April 17th. If you care to accept the attached letter in lieu thereof you may do so; otherwise I have no alternative but to retire from the Des Moines work and refer the whole matter to my Seattle attorneys for immediate action.

"Kindly let me know your attitude at once, as I have some pressing matters requiring my presence in Seattle.

"Yours very truly,
"Pearson Construction Company.
"By —————."

The witness was unable to produce the proposed letter which was inclosed in the letter of April 19th. In order to understand the situation, it should be stated at this juncture that the owner contends that the letter inclosed in the above-mentioned communication of April 19th was the very agreement which it is now claimed was prepared by Mr. Knudsen and is hereinabove set forth. The witness continued:

"I again saw Mr. Knudsen on April 23, 1918. I saw him in his office at the Ford plant in Detroit. I had been served with a writ of garnishment by the Trus Con Steel Company on the 21st or 22d, and I thought it was the best thing under the circumstances to simply go back to Knudsen and tell him that I would sign the letter, which I did. * * * I had the letter of the 17th with me. I put it on the table before us and I said, 'I am willing to sign it,' or 'It seems to be the best way under the circumstances for me, for I do not see any hope to get peace with the architect, when they follow me with garnishments; as soon as I get any money they will garnishee me and bother me.' The Trus Con Steel Company had served previous garnishments upon me. Julius Kahn, president of the Trus Con Steel Company was a brother of Albert Kahn and I knew they were closely connected. They had been bothering me right along. * * * He took the letter and went out with it and stated he would put it 'into legal form.' He was out for about, I think, a quarter of an hour,

and he come in with that letter and another letter. I signed, and he gave me this here [the letter of April 23d] and told me it was the same thing. I began to read over the other letter."

" * * * Q. Now, what did he tell you when he gave it to you? A. He told me that it was the same as the one they wrote out the 17th for me, which he handed to me, and which I put in the pocket.

"Q. Did you read any part of that? A. I just started in to read this first paragraph here, and everything looked alike, and he told me that it was the same, so I signed it."

The witness further testified that Knudsen did not then give him a copy of the letter of April 23d, but that in May the witness wrote to his son Conrad Pearson, who sent him a copy. He stated the reason he signed the letter was because he had absolute confidence in Mr. Knudsen. Witness further testified that on April 16, 1918: "We had presented a claim for $189,000.00 against the Ford Motor Company. When I signed the letter of April 23, 1918, I did not know that I had waived every claim I had against the Ford Motor Company. When I signed the letter of April 23, 1918, I did not know that the clause in the original letter where I reserved my claim for extra damages, etc., had been changed so that all claims were released and canceled."

On cross-examination the witness testified that Mr. Knudsen's first draft of the agreement of April 17th was in longhand; that he took it out and returned in about 20 minutes with a typewritten letter. With reference to the alternative proposition contained in the letter of April 19th, he testified that he did not know what it was, he never kept a copy of it. "He told me its contents."

With reference to the above-quoted letter of April 17th, which the witness testified was prepared by Mr. Knudsen and redelivered by him to Mr. Knudsen on the 23d, the witness again testifies: "I took the letter of the 17th [prepared by Knudsen] out of my pocket and put it on the table and said I was willing to sign it. He said he had to put it in legal words."

"Q. You say he said he had to take it out and put it in legal words? A. Yes.

"Q. And that was his excuse for taking it out then? A. Yes. * * *

"Q. And that is the reason he gave you when he got it, that he had to take it out and put it in legal words? A. Yes. * * *

"Q. And did you wait there while Mr. Knudsen was out of his office getting this put in legal form? A. Yes, I did.

"Q. How long was he gone? A. Why, I cannot say exactly, but it was quite a little time.

"Q. Quite a little time? A. Yes.

"Q. And then he brought you back and gave you what? A. He give me this letter back that I gave him, [of April 17th] and I put the other one [of April 23d] on the table and I signed it.

"Q. Now this letter that you gave him, and he gave you back,—you never signed that, did you? A. No, that wasn't signed.

"Q. Now, you say you compared—you started in to read this new paper that he gave you, and you read a paragraph of it, and you found out that it was the same—did you say? A. Why he told me it was the same, and it looks the same to me.

"Q. You read a part of it, did you? A. I read about the first paragraph."

The contractor, however, although testifying that Mr. Knudsen told him that the two documents then before him were the same, knew that the purpose of rewriting the instrument was to put it in legal form, and that therefore knew they were not the same in context; that is to say, he knew that the purpose of Mr. Knudsen in taking the instrument out for a considerable space of time was to have its context changed. If Mr. Knudsen had stated to him that he merely wanted to typewrite the instrument so that an original instead of a copy might be signed, and had returned the typewritten document stating that it was exactly the same as the carbon copy, and if the release clause had been so placed in the instrument that it would escape a cursory examination, we would have a situation where a signature to a document was obtained by trick and device, but we have here a misrepresentation as to the legal effect of a document rather than its context. It is a fundamental rule that a person in possession of all his faculties, who signs an instrument for the purpose of giving effect thereto, cannot evade the consequences of the document by merely neglecting to read it. Upton v. Tribilcock, 91 U. S. 45, 50, 23 L. Ed. 203. If his signature is secured by some fraudulent trick or device as to the context thereof, which prevents him from reading the document he signs, he may by proper action avoid the consequences which would otherwise result from such instrument. Whether he can avoid the consequences of the instrument he signs by rely-

ing upon the fraudulent misrepresentations of the other party as to the legal consequences or the legal effect of the instrument without reading it is a question upon which the authorities are in disagreement, and which we need not determine. See Toledo Computing Scale Co. v. Garrison, 28 App. D. C. 243; Whiting v. Davidge, 23 App. D. C. 156, 165; Colorado Inv. Loan Co. v. Beuchat, 48 Colo. 494, 111 P. 61; Granger v. Kishi·(Tex. Civ. App.) 153 S. W. 1161; Lotter v. Knospe, 144 Wis. 426, 129 N. W. 614; Chesapeake & Ohio R. Co. v. Howard, 178 U. S. 153, 167, 20 .S. Ct. 880, 44 L. Ed. 1015; Mardis v. Miller (C. C. A.) 241 F. 470; Commercial Finance Co. v. Cooper, 196 Ala. 285, 71 So. 684; J. I. Case Threshing Machine Co. v. Southwestern Veneer Co., 135 Ark. 607, 205 S. W. 978, 979; McBride v. Macon Tel. Pub. Co., 102 Ga. 442, 30 S. E. 999; Gale Mfg. Co. v. King & Dickey, 104 Kan. 210, 178 P. 621; National Cash Reg. Co. v. Marrigan, 148 Minn. 270, 181 N. W. 585; Finkelstein v. Henslin et·al., 152 Minn. 386, 188 N. W. 737; Vermont Farm Mach. Co. v. Ash, 23 N. M. 647, 170 P. 741.

■■ In the case at bar the contractor seeks to avoid the consequences of an agreement he signed without reading, because of representations leading to the conclusion that it was the same in legal effect as a similar document lying on the table upon which he signed the disputed document. No case has been called to our attention where an experienced contractor, acting in the matter upon the advice of an attorney with whom he is consulting in relation to the terms of an agreement, who has participated in the correspondence in relation thereto, has been excused from reading an agreement resulting from such negotiations for compromise and settlement and from submitting it· to his attorney at the first opportunity merely because its legal effect has been intentionally misrepresented by the other party. It is incredible that an attorney for a contractor, charged with so great a responsibility as that involved in the execution of the agreement of April 23, 1918, who also represents the surety company on the contractor's bond which would be released thereby, should fail to see or examine such a contract involving so large an amount, merely because the contractor was told by the owner's agent that the new writing he was signing was the same in legal effect as one theretofore submitted to the attorney and rejected by him. This attorney, Mr. Mason, as has been pointed out, was not called as a witness to identify the proposed agreement of April 17, which the record shows was submitted to him for his opinion therein, but Mr. George Cushwa, an attorney and associate manager of the bonding company, testified that the contractor, in Detroit, handed Mr. Mason a copy of his letter of April 23, 1918, and the owner's reply dated April 26, 1918. Ordinarily, parties are bound by their written contracts, and the exception to that rule in case of intrinsic fraud is usually invoked in favor of an illiterate or inexperienced person or one who by reason of pain or suffering or mental weakness is induced to execute a writing by fraudulent representations as to its contents which prevent him from reading the document, and from submitting it to some experienced advisor or to an attorney, or there is some real or simulated need for haste in the signing which tends to prevent the signer from reading it, or there may be some relation of trust or confidence which tends to cause the defrauded. party to neglect usual precautions. None of these elements were present in this case. The only allegations or evidence along that line is the allegation and evidence in relation to the friendship of the contractor and Knudsen, which falls far short of establishing such a relationship as would justify the contractor in neglecting to use the precautions exercised by men of ordinary prudence and required of them by law in such an important affair. Considering the probabilities of the situation as disclosed by the contractor's evidence with a view of ascertaining whether the evidence of fraud in the execution of the agreement of April 23, 1918, is clear and convincing, it should be noted that the draft of the letter of April 17th which the contractor testifies he thought he was signing is inconsistent on its face. It will be observed in paragraph 2 of this letter that it is stated that it would cost "$40,000 more to finish the contract than the amount now due"; that the contractor had already paid out $90,000 more than he had received, and said, "I feel justified in requesting the Ford Motor Company to cover any further loss which certainly will be entailed if the work is to be completed." It is difficult to interpret this clause of the letter in any other way than a proposition on the part of the contractor to suffer a loss of $90,000, provided that the owner would accept a loss of $40,000. The third paragraph clearly indicates the intention of the contractor that the owner shall suffer the loss, whatever it might be, resulting from taking charge of and completing the work. The last paragraph also states that he is unable to finish the job, and that he therefore requests the owner to do

so. The clause in controversy in this case, to which the contractor testifies he believed he was agreeing, is the last sentence in the third paragraph: "In further consideration of your compliance with this request I agree that all claims for profit, extras or further payments under the contract or arising from the job, shall be deferred for consideration after completion of the building."

While it is not necessary for us to determine fully the legal effect of this clause, in view of our conclusions, we have in this purported draft of the contractor's letter an admission that he had already suffered a loss of about $90,000 and a request that the owner suffer a loss of $40,000, "which certainly will be entailed if the work is to be completed," and yet proposing to postpone his claims for profit until the building is completed. He also is to postpone his claims for extras, or further payments under contract or arising from the job, until after completion of the building by the owner. The contract itself, of course, fixed the contract price and the amount of profits, if any. It also made provision for payment for extras. It also authorized the owner to take over the job and complete it under certain contingencies, and regulated the rights of the parties in that event. The clause in controversy was a proposal to await the completion of the building by the owner for a determination of these matters, and this is in conflict with the proposal that the owner suffer the loss yet to be incurred as a result of such completion. The owner contends, and his witnesses testify, that in lieu of this clause the letter of April 17, 1918, contained a release clause in the same language as in the letter of April 23, 1918, signed by the contractor, as follows: "In further consideration of your compliance with this request I agree to relinquish to you all my rights under the contract, take the loss already incurred by me, release and cancel all claims for profit, extras or further payments under the contract, or arising from the job."

It will be observed that this sentence is in entire harmony with the purpose and effect of the document taken as a whole. It puts in legal phraseology the effect of paragraph 2 that the contractor will suffer the losses that he had incurred up to the time the owner took over the contract, and the owner will undertake to complete the contract and suffer any loss due to the excess of cost completion over the amount still due under the contract. It should be borne in mind that the draft of April 17, 1918, and the document signed by the contractor dated April 23, 1918, were in the form of a letter from the contractor to the owner, and that, when the letter was signed, it was still a proposal, and was not effective as an agreement until it was accepted, which acceptance is in the form of a letter dated April 26, 1918, signed by the owner accepting the proposal of April 23, and agreeing "to take over the work in accordance with the proposal." In order to explain more fully the situation with reference to the release clause, the owner produced in evidence the original letter drafted in pencil by Mr. Knudsen in the presence of the contractor. The contractor had testified that such a draft was so written. This pencil letter does not contain the release clause, but the balance thereof is in substantial conformity with the typewritten letter of April 17th, produced by the owner. Attached to the pencil draft by Knudsen is a release clause also written in pencil in the handwriting of the attorney for the owner. The final form of the letter dated April 23, 1918, is substantially in the language of these two pencil drafts. It is the contention of the owner, supported by the testimony of the attorney who wrote the release clause, and of Mr. Knudsen, who wrote the balance of the letter of April 17th, that on April 17th the attorney insisted upon the incorporation of the release clause in the proposed letter, and that the typewritten letter of April 17th, combining the two pencil drafts, was written out then in the office of said attorney on that date, and was then and there handed to the contractor. This proposed letter was practically identical with the letter the contractor testifies was then and there handed to him, with the single exception that in the draft produced from the files of the attorney's office the release clause is incorporated, while in the one produced by the contractor is the above-quoted disputed clause in lieu thereof. The question then is, Who substituted one clause for the other? Was the letter first written by the owner's attorney with the release clause as he testified, and did the contractor substitute the clause deferring a settlement, or did the attorney for the owner first write the latter clause, as the contractor testifies, and did the attorney or Mr. Knudsen afterward make a fraudulent substitution?

It is the contention of the appellant that the letter of April 17th which the contractor now says he thought he was signing, is a copy of the letter which was prepared by the contractor's attorney and mailed April 19, 1918, to the owner as a counter proposal to the letter prepared by the owner's attorney, and that the substitution involved in the action is

870

not a fraudulent substitution made by the owner's representatives at the time of the signing of the instrument, but is a bona fide counter proposal of the contractor. The context of the letter which the contractor claims he thought he was signing is much more consistent with the attitude which would naturally be taken by his attorney, acting for his bonding company as well, than that which would be taken by an attorney representing the owner who was to agree by accepting the proposal to suffer a loss declared to be at least $40,000 and to take over and complete the work which the contractor and the bonding company were under obligations to do. Here again note that no claim for a breach of contract was then advanced by the contractor. The attorney for the bonding company, Mr. Mason, was not produced by the contractor as a witness and no reason is shown why he was not produced. He would be likely to know and to remember whether the document prepared by Mr. Knudsen and brought to him by the contractor on April 17th contained a clause releasing the owner from further liability to the contractor. If the agreement of April 17th, handed to Mr. Mason, did not contain a release clause, and did in lieu thereof agree to postpone settlement of the contractor's claims until completion, and provide that the owner should suffer all future loss due to completion, why did Mr. Mason so promptly reject it and draft a counter proposal? The indications are that the draft of the letter of April 17th, now relied upon by the contractor, is this very counter proposal.

It is true that on appeal we must give full credence to the veracity of a witness whose testimony tends to sustain the verdict, where that witness has appeared before the jury and they have had an opportunity to test his memory, intelligence, and veracity, but it does not necessarily follow that this court is bound to assume that the memory of any witness is infallible. The contractor testified flatly that he did not know nor remember the contents of the counter proposal inclosed in his letter of April 19th. He was unable to state either the substance or effect of it. He was only certain that the document he now claims was handed him by Mr. Knudsen and which he intended to sign is not the document or counter proposal prepared by Mr. Mason, his attorney, and rejected by the owner. His testimony is this definite and certain, but is it clear and satisfactory and convincing? Why should he so definitely remember the exact content of two letters, and so wholly forget another prepared on his behalf between the two? When did he become acquainted with the contents of his letter of April 23, 1918? He testifies that he signed this document dated April 23d without reading it, and that he did not get a copy of it until exactly one month later when he received it from his son, who, as his agent, had evidently theretofore received a copy of it. He did not complain that he had been defrauded or tricked by a substitution of documents from that day until the time of the trial, nearly ten years later, when he for the first time testified that there had been a substitution of documents when he signed the letter of April 23, 1918. The owner avers in his brief, and the evidence seems to sustain the contention, that the first knowledge the owner had of the claim that there had been a substitution of documents for the purpose of defrauding the contractor was at the time of the trial, when the witness produced an unsigned letter dated April 17th, and gave his testimony with relation thereto.

This suit was begun in October, 1918. Over four years later the contractor addressed a letter dated June 25, 1923, to Mr. Knudsen who was no longer employed by the owner, soliciting his aid in the pending litigation, and making certain complaints concerning the owner's conduct in relation to the building operations, but there is no suggestion in the letter that Mr. Knudsen had tricked him into signing the release of April 23, 1918. Even more significant, however, is the fact that even in his pleading, in reply to the release, he makes no such claim. His allegations in relation thereto cover four pages of the transcript, and for that reason cannot be set forth at large in this opinion. He avers in substance that it was proposed and agreed to that it was for the sole and only purpose of voluntarily allowing the owner to complete the building under the terms of the contract with reference to the completion by the owner in certain contingencies, which terms are set out as an exhibit to the reply. He then proceeds to allege what he claims was the agreement between the parties with reference to the completion. He then alleges that the owner has abandoned the agreement of April 23, 1918, and that the agreement was obtained by fraud and misrepresentations. The fraud alleged, however, is not that now relied upon to invalidate the release. So far as it relates to the instrument which the defendant expressly admits that he signed, it is as follows:

"That plaintiff has not received an education in the English language and did not understand the said agreement except as rep-

resented to him, and did not agree to waive his claim for any sum or sums then due him from defendant, and denies that he accepted the completion of the building for the consideration of waiving the large sums due him or any sums whatever, and that any expression to the contrary was not the agreement thereof."

The significance of this pleading is twofold. In the first place, as an indication that as late as 1926, when this reply was filed, the contractor was not complaining that he had been deceived by the substitution of documents, as he testifies in 1928. In effect, he admits that he knowingly signed the agreement or letter of April 23d, but claims that he did not understand it "except as represented to him." This is far from a specific allegation of a fraudulent substitution of documents or of fraudulent representations by the owner of its contents or legal effect.

In the second place, this reply did not justify the reception of the evidence with reference to the obtaining of the agreement by trick and device. The evidence was objected to by the owner, and his objection was overruled. The objection should have been sustained. We are not considering the question of whether or not, under a general denial of the execution of the agreement, evidence that the document was obtained by trick and device would be admissible in an action at law on the theory that the agreement was wholly void, but whether, under pleading which expressly admits that an agreement was made and a document was signed to evidence that agreement, such evidence to impeach the document pleaded is admissible under the above reply. In view of the circumstances admitted or testified to by the contractor, and in view of the contents of the document submitted in evidence, and in view of the pleadings verified by the contractor, it cannot be said that the present recollection of the contractor as testified to by him is so clear and convincing as to establish satisfactorily the fraudulent substitution of documents by the owner of which the contractor now complains.

We therefore hold that the reply of the contractor to the agreement of April 23, 1918, does not raise the issue of intrinsic fraud; that evidence thereof should have been rejected; that the evidence of such intrinsic fraud erroneously received does not tend to show that the agreement was wholly void; that the evidence does not establish clearly and convincingly beyond a reasonable doubt that there was intrinsic fraud in the procurement of the said agreement (see Pomeroy's Equity Jurisprudence (2d Ed.) § 2103, p. 4789, same as section 682 of 1st Ed.); and this is true whether the contractor's attack thereon be regarded as one at law or in equity, and that the motion of the owner for a directed verdict should have been granted.

Judgment reversed.