(No. 22661.—

THE COMMERCIAL MERCHANTS NATIONAL BANK AND TRUST COMPANY *et al.* Appellants, *vs.* FRANK KLOTH *et al.* Appellees.

*Opinion filed April 12, 1935—Rehearing denied June 5, 1935.*

CLARENCE W. HEYL, for appellants.

GEORGE W. SPRENGER, for appellees.

Mr. JUSTICE HERRICK delivered the opinion of the court:

The Commercial Merchants National Bank and Trust Company, a corporation, as conservator of Jennie Brainard, an incompetent person, filed a bill, subsequently amended, in the circuit court of Peoria county to set aside a conveyance of certain land and the transfer of certain personal property consisting of notes, mortgages and securities from Jennie Brainard to Frank Kloth, for the re-delivery of the personal property so transferred, and to set aside a conveyance by Frank Kloth to Grace Kloth, on the ground of the mental incompetency of Jennie Brainard and because Frank Kloth and Grace Kloth exercised undue influence

over her when they occupied toward her a fiduciary relationship. The matter was referred to a master in chancery, who heard the evidence and made a report recommending that the bill as amended be dismissed for want of equity. Objections to the master's report, which were overruled, stood as exceptions before the chancellor. The exceptions were overruled and the bill as amended was dismissed for want of equity. From that decree this appeal was prosecuted.

The death of Jennie Brainard was suggested, and other persons were made parties to the suit upon a motion made in this court.

Jennie Brainard was the widow of Charles D. Brainard, a business man and president of the Central Electric Company of Peoria. He died in 1924, and left to his widow, with other property, the homestead at 903 Jackson street, Peoria. She thereafter acquired certain notes, mortgages and stock, much of which is the subject of this suit. Before and after her husband's death different persons took care of the house, prepared the meals and performed household labor for her. Mrs. Brainard had a daughter and grandchildren and was on friendly terms with all of them, although she in the later years, without cause, so far as the record discloses, became distrustful of them. A grandson, from the time he was two years of age, lived at the Brainard home until he was twenty-two years of age, when he married and in 1928 moved from the Brainard home. After her husband's death Mrs. Brainard ate her evening meal at a restaurant about a mile distant from her home, from which she went and returned by automobile or in a taxicab. Frank Kloth, one of the appellees, was a taxicab driver and for a period of time drove Mrs. Brainard to and from the restaurant and took her to other places. In October, 1930, he and his wife took up their residence with Mrs. Brainard and remained there until a conservator was appointed for her, in February, 1931.

On March 10, 1930, an officer of a bank in Peoria where Mrs. Brainard kept her securities delivered to her a mortgage executed by Rollin T. and Clara E. Martin for $5000, with $500 paid thereon, an assignment of the mortgage and an abstract of title to the property mortgaged; mortgage papers of William H. Harrison for $3000, an assignment of the mortgage and an abstract of title to the property encumbered; a mortgage of Margaret T. and D. E. Smith for $2300, with $100 paid thereon, with the accompanying papers, and Mrs. Brainard gave a receipt for all of these securities, which she then owned. Frank Kloth was present. Thereafter the title, by assignment or. transfer of these securities, was in Kloth or his attorney and by one or the other sold and the proceeds received by the one making the sale. Fifty-six shares of stock in the Keystone Steel and Wire Company previously owned by Mrs. Brainard were sold by Kloth's attorney and he received the proceeds either for himself or Kloth.

On April 29, 1930, Mrs. Brainard by a warranty deed, for a stated consideration of one dollar and other valuable consideration, conveyed and warranted to Frank Kloth the homestead heretofore mentioned. The deed contained the following provision: "subject to the right of the grantor herein to the possession, use and enjoyment of said premises for and during her life, which right is hereby reserved." The actual consideration was $3500. By quitclaim deed bearing date of November 3, 1930, Kloth conveyed the same premises to his wife, Grace Kloth.

Twenty-four witnesses for the appellants testified upon the question of the mental capacity of Mrs. Brainard at and for some considerable time immediately prior to the transfers to Frank Kloth of the real estate, mortgages and stock heretofore mentioned. Among the witnesses were a daughter, two grandsons, a son-in-law, her physician, former employees, neighbors, persons at places where she traded, employees of the restaurant where she ate, and

others who met her in other relationships. Without setting forth the testimony of each witness separately, it was adduced from the entire evidence on behalf of appellants that Mrs. Brainard was at the time of the trial eighty-five years of age, frail and in poor health. She had arteriosclerosis of the senile type, valvular organic heart trouble, and in July, 1931, had a stroke of cerebral apoplexy. There were occasions when she was unable to talk and she suffered a loss of memory. She had been treated by a physician for a period of fifteen years and for the four years previous to the trial he had averaged seeing her once a week, sometimes less frequently but in other weeks more frequently. She was subject to falling without warning and had three or four accidents from that cause. She required assistance in walking. One or two witnesses stated that at times she was stubborn. All of the witnesses except one who testified upon the subject said that she had not been accustomed to transact business except of a very simple nature and that she had very little business ability. The physician admitted that she paid his bills, and one witness thought that about the time of her husband's death she had considerable business ability but that thereafter she became forgetful. Her husband paid the grocery bills in his lifetime and Mrs. Brainard's clothing was selected for her by others. She was a vice-president of the Central Electric Company and owned one share of its stock, but she held the position merely in accordance with her husband's will and did nothing in connection with the business of the company. In conversation she would not continue on the same subject but would suddenly change to another topic. She repeated conversations she previously had, and would forget that she had seen or been with persons she had met or visited even on the previous day, and occasionally would not know persons with whom she was well acquainted. She did not in a bank recognize her grandson, who was very close to her, although she looked di-

rectly at him. She would forget that she had in her possession papers which were at the time in her safety deposit box. She would forget that she had ordered merchandise by the time it was delivered to her home. She frequently dropped her money and miscalculated her change in paying bills for merchandise and for meals at the restaurant. She would forget that she owed money for work performed for her; would refuse to take medicine prescribed for her; became easily angered; distrusted her relatives and thought they were trying to obtain her money, although they knew nothing of her business affairs and were not confided in by her. Among specific instances of facts which were variant from normal conduct, it was related that on one occasion she kicked a man seated beside her in the restaurant because she did not wish him to sit beside her. On one occasion she became confused about a date, thinking it was near New Year's day though it was not near that time of the year. One day when her grandson called to take her to a bank, which was in accordance with a previous arrangement, without explanation she directed him to take her to a chiropodist and then to a club, without any further mention of the bank. She once threatened to jump in the river because a suggestion was made to her that she should have someone care for her. She was unable, or appeared to be unable, to explain to her grandson what amount she was to receive for her home at the time of the sale to Kloth and did not seem to understand the nature of the transaction. She mistakenly thought she was entitled to receive $100 per month from the Central Electric Company whether that corporation was making money or not, even though the matter had been fully explained to her. Her physical and mental weakness progressed with age. Most of the witnesses expressed the opinion that she was of unsound mind on and prior to April 29, 1930, and that she was unable to transact ordinary business about that time, basing their opinions upon their respective state-

ments of the different facts related and from their observation of her.

Fewer witnesses testified to facts relating to a fiduciary relationship between Kloth and Mrs. Brainard. This latter evidence is to some extent largely circumstantial. One witness testified that whenever she called upon or visited Mrs. Brainard, Frank Kloth was always present and the witness was not permitted to remain alone with Mrs. Brainard. The same witness asked Mrs. Brainard on one occasion if she wished to visit the former's home, and the reply was, "They won't let me." Who was meant by "they" is only inferable from the other evidence as the appellees. At another time Mrs. Brainard said that she was hungry and the witness prepared a dinner for her. The same witness testified that Mrs. Brainard said that Kloth kissed her good night and had asked her to marry him, and when she told him that she was old enough to be his grandmother, he remarked that he would make her a good husband, take care of her interests and see that she had a good time. Kloth wore a diamond ring which had belonged to Charles D. Brainard. She told a witness that Kloth had borrowed money from a man for the purpose of a settlement in a divorce proceeding with his former wife. Kloth asked Mrs. Brainard for $500 with which to re-pay the loan and she gave him the money. During their brief relationship, property that was hers at the inception of the relationship appears next in either the name of Kloth or he is exercising control over it.

The evidence discloses that Kloth's occupation was that of taxicab driver. He possessed a small Ford automobile, but after becoming acquainted with Mrs. Brainard he acquired a new Hupmobile. Kloth had inherited some property about the time of his first marriage, the character or amount of which is not shown, except that the father of his first wife testified that it was all consumed in Kloth's defense on a criminal charge. This evidence was not con-

tradicted. Kloth and his wife, or one of them, assisted Mrs. Brainard when she went to the bank. A short time after the delivery to Mrs. Brainard of her securities on March 10, 1930, all except the Harrison mortgage had come to the possession of Kloth or his attorney and were sold or negotiated and the proceeds obtained by Kloth. Kloth had acquired Mrs. Brainard's homestead, valued by appellants' witnesses at $8000 or $10,000, for $3500, subject to a life estate of Mrs. Brainard. There was some evidence that she was unable to explain the nature of the transaction, and one witness said she told him she was receiving about $8000 for her home.

On behalf of appellees, their attorney testified that on April 29, 1930, he, as a notary public, took the acknowledgment of Mrs. Brainard to the execution of the deed to Kloth, but before doing so questioned her as to the amount she was to receive, explained to her the legal effect of the reservation of the life estate, and asked her whether the amount she was to receive was fair. During the twenty minutes she was present he had an opportunity to observe her mental and physical condition, and he formed the opinion that she was capable of knowing the fairness of the price she was to receive and understood the nature of the transaction. He made no charge and received nothing for his services as notary public. Three witnesses for the appellees estimated the value of the real estate conveyed by Mrs. Brainard to Kloth as follows: One thought its cash value was somewhere between $3800 and $4000; another that it was worth $4500, but subject to the life estate of a woman aged eighty-four years it was worth $3500; and the third witness thought the house was worth about $5000, but its value would be diminished if the land were subject to a life estate.

Among the questions presented are: (1) Was there a fiduciary relationship existing between Frank Kloth and Jennie Brainard; (2) whether the conveyance of real es-

tate and transfers of the personal property from Jennie Brainard to Frank Kloth were valid, or because of the unsoundness of mind of the former and the undue influence of the latter while there was a fiduciary relationship between them they were invalid; and (3) whether certain excluded evidence was privileged from disclosure because of the relationship of attorney and client.

The courts have always refrained from attempting to give a definition applicable to all possible cases in which the fiduciary relation might arise. Such relation, however, does embrace every possible situation where confidence is reposed on the one side with the resulting superiority on the other. Where the facts reveal that trust is confided in one and accepted by him the fiduciary relation is created. The character and the duty of the relationship are immaterial. They may be legal but not necessarily so. They may be social, domestic or personal, and their origin is wholly immaterial. (*Swiney* v. *Womack,* 343 Ill. 278; *McCord* v. *Roberts,* 334 id. 233; *Schweickhardt* v. *Chessen,* 329 id. 637; *Tanner* v. *Tanner,* 326 id. 302; *Seeberger* v. *Seeberger,* 325 id. 47; *Feeney* v. *Runyan,* 316 id. 246.) Where one voluntarily assumes the confidential relation towards another, he will not be permitted, at the expense of such relation, to deal in the property of the opposite party for his own pecuniary profit. (*McDonnell* v. *Holden,* 352 Ill. 362.) The burden is on the fiduciary to show the fairness of any transaction between him and the grantor, the mental capacity of the grantor, and that the transaction was just and equitable. (*Hensan* v. *Cooksey,* 237 Ill. 620; *Fish* v. *Fish,* 235 id. 396; *Mayrand* v. *Mayrand,* 194 id. 45; *Thomas* v. *Whitney,* 186 id. 225.) Before a court of equity will permit a transaction between parties occupying a fiduciary relation to stand, the dominant party who has profited thereby must overcome the presumption of fraud by clear and convincing proof that he has exercised good faith and has not betrayed the con-

fidence reposed in him. *Hagerman* v. *Schulte*, 349 Ill. 11; *Warren* v. *Pfeil*, 346 id. 344; *McCord* v. *Roberts*, *supra*; *Mors* v. *Peterson*, 261 Ill. 532; *Beach* v. *Wilton*, 244 id. 413; *Dowie* v. *Driscoll*, 203 id. 480; *Thomas* v. *Whitney*, *supra*.

In *Cowee* v. *Cornell*, 75 N. Y. 91, 31 Am. Rep. 428, it was said: "Whenever, however, the relations between the contracting parties appear to be of such a character as to render it certain that they do not deal on terms of equality, but that either on the one side from superior knowledge of the matter derived from a fiduciary relation or from over-mastering influences, or on the other from weakness, dependence or trust justifiably reposed, unfair advantage in a transaction is rendered probable, then the burden is shifted, the transaction is presumed void, and it is incumbent upon the stronger party to show affirmatively that no deception was practiced, no undue influence was used, and that all was fair, open, voluntary and well understood."

The facts here shown of the frequent and intimate association of the defendant Frank Kloth, a man about thirty years old, with this feeble old lady about eighty-four or eighty-five years of age, failing both physically and mentally during the period of such association, irresistibly convince one that she reposed trust and confidence in him with his knowledge and consent and that he was the dominant party in such relationship.

It is apparent from the following facts that the testimony of the attorney, if not exempt on the ground of privilege, would have an important bearing on the issues presented: He was called as a witness for the appellants at the hearing before the master in chancery. He had never been attorney for Mrs. Brainard but represented Kloth. He was asked the following questions: Whether there were any mortgages delivered to him in the years 1930 and 1931, and separate questions specified the par-

ticular mortgages; whether he received the proceeds of a sale of stock of the Keystone Steel and Wire Company; whether a draft, the proceeds of a mortgage owned by Mrs. Brainard, shown him, bore his endorsement, and whether he received the proceeds thereof or turned the money over to Frank Kloth; whether a letter purporting to have been signed by him which stated that he represented the owner of the mortgage of Margaret T. Smith for $2300 bore his signature. An objection was interposed by Kloth to each of these questions on the ground of privilege from disclosure because of the relationship of attorney and client, and the objection was sustained. The attorney was afterward called as a witness for the appellees, and testified that he acted as a notary public when the deed from Mrs. Brainard to Kloth was executed but that he was not attorney for Mrs. Brainard. Thereafter counsel for appellants presented a petition to the court requesting a re-reference of the cause to the master, with directions to require Kloth's attorney to answer the questions propounded to him as to which exemption from disclosure was claimed. A motion to strike the petition was granted. The objections to the master's report, however, urged as error the sustaining of objections to the foregoing and other questions of like character.

The evidence shows that Kloth was frequently in the office of his lawyer in 1930 and 1931. Kloth's attorney made inquiries by letter concerning certain mortgages, attempted to discount one of them, and notified the bank formerly in charge of the mortgages to have nothing further to do with them. Between March 10, 1930, and January 10, 1931, Kloth received, either directly or by his attorney, property, or the proceeds thereof, which had recently been the property of Mrs. Brainard, as follows: A deed to 130 acres of land in the State of Oklahoma which was covered by the Smith mortgage for about $2300, delivered by the bank on March 10, 1930, to Mrs. Kloth, which

mortgage and note were surrendered in consideration of
the conveyance of the premises to Kloth; $3902.77, repre-
senting the proceeds of the Martin mortgage, discounted,
on property in the State of Montana, and which amount
was credited to Kloth's attorney's account; $3918.88, be-
ing the proceeds of fifty-six shares of stock of the Key-
stone Steel and Wire Company. Kloth procured from Mrs.
Brainard property owned by her as a homestead for $3500,
with a reserved life estate, valued by appellants' witnesses
at $8000 to $10,000. Kloth obtained from Mrs. Brainard
real estate and personal property herein mentioned with-
out a showing that she received an adequate consideration
therefor.

Appellees' counsel in his brief states that there is nothing
in the record to warrant the statement in the brief of coun-
sel for appellants that the Keystone Steel and Wire Com-
pany stock was sold by Frank Kloth or that he ever re-
ceived any of the proceeds of it. Kloth's attorney did not
represent Mrs. Brainard, and if he did not represent Kloth
there is no evidence that he represented any other person
and it was not shown that he had any personal interest in
the transaction, and he was not permitted to relate the facts
by reason of the objection made by his client, Kloth, that
his knowledge was privileged. A grandson of Mrs. Brain-
ard, who had known the attorney in school, talked with
him about Mrs. Brainard's physical and mental condition
subsequent to the real estate transfer to Kloth. He told
the attorney that his grandmother was not capable of man-
aging her own affairs, and asked the attorney to commu-
nicate with him or some member of the family in the event
of further proposed transactions by her of that nature.
The attorney continued for several months to assist Kloth
in disposing of the securities which had so recently been
the property of Mrs. Brainard. Between April 30, 1930,
and February 5, 1931, $3000 had been withdrawn from

Mrs. Brainard's account at the bank, and on February 18, 1931, the amount remaining to her credit in the bank was $456.29. How the personal property heretofore mentioned was obtained from Mrs. Brainard and reached the possession of Kloth or his attorney is not disclosed by direct evidence. The method and facts concerning the disposition of the stocks and securities were pertinent to the issues presented. The testimony of Kloth's attorney would have thrown light upon the subject. We do not find it necessary to decide whether he was properly excused from testifying, but as is herein shown it was incumbent upon appellees to produce evidence from some source upon the subjects about which inquiries were made of Kloth's attorney and disclose that the transactions were fair to Mrs. Brainard.

While there was no direct evidence of an actual attempt to exert undue influence upon Mrs. Brainard, one or the other of appellees was present with her whenever she went to the bank. Direct evidence was not required. We rarely expect to find direct and positive evidence showing fraud. Like all other facts, it may be proved by circumstances which convince the mind of its existence. (*Garlick* v. *Imgruet,* 340 Ill. 136; *Gray* v. *Solomon,* 338 id. 433; *Duncan* v. *Dazey,* 318 id. 500; *Cohen* v. *Friedman,* 259 id. 416; *Schwarz* v. *Reznick,* 257 id. 479.) A presumption arises against the validity of a conveyance where real mental weakness of one of the parties, not of itself sufficient to destroy capacity, is accompanied by undue influence, inadequacy of price, advantage taken of pecuniary necessities, ignorance and want of advice, misrepresentations or concealment, and the like, to the advantage of one over the other. (*Hinkley* v. *Wynkoop,* 305 Ill. 115.) It was not essential that appellants show fraud, but under the foregoing and other authorities it was essential that good faith be shown by appellees. Mrs. Brainard reposed confidence in the appellees—particularly in Frank Kloth.

He acquired a better automobile after he became interested in her affairs. Mrs. Brainard assisted him financially. He and his attorney became possessed of much of her personal property and disposed of it without a satisfactory disclosure that she received an adequate, or any, consideration for it. Kloth had been a taxicab driver and had served Mrs. Brainard in her home. He was not a business man, and it was not shown that by previous experience and training he would be qualified to become the confidential representative of the aged widow of one of the leading business men of Peoria. Mrs. Brainard was between eighty-four and eighty-five years of age, physically feeble and mentally weak. A short time after the transactions here involved she was adjudged incompetent. While there was an attempt to show that the conveyance of the homestead to Kloth was fair and that Mrs. Brainard received a fair price, the evidence is not convincing of the fairness of that transaction, and is much less so as to the other transactions. The burden was upon the fiduciary, Kloth, to show their fairness. By interposing the objection that the witness was his attorney at the time the different mortgages and shares of stock came to the attorney's possession and that his communications with respect to them were privileged, he by that objection practically admits that they were for his, Kloth's, benefit. By obstructing an investigation of his own conduct he prevented a full disclosure of pertinent facts, necessary to be shown in some way from some source, which would overcome the presumption of unfairness raised by the facts and circumstances which were in evidence and as to which the burden of proof was upon him. A fiduciary relationship between Kloth and Mrs. Brainard was established, and appellees have failed to show that the transactions between her and him were in good faith and fairly carried out.

Lastly, it is contended that even though the deed was obtained by Frank Kloth by fraud from Mrs. Brainard,

yet inasmuch as Kloth conveyed the premises to Grace Kloth, his wife, his conveyance to her cannot be set aside in this proceeding. The deed to Grace Kloth bears date of November 3, 1930. It was not filed for record until February 11, 1931. It is a circumstance worthy of notice that this deed was not filed for record until the second day after the petition for the appointment of a conservator for Mrs. Brainard. The consideration recited in this deed is one dollar and other valuable considerations. No evidence was offered by Grace Kloth tending to prove what the real consideration was. The evidence shows that she had an actual acquaintance with Mrs. Brainard and knowledge of her mental condition. There is no evidence whatever in the record to prove or tending to prove that the transaction between Kloth and his wife was a *bona fide* transaction. The evidence shows that title to the premises was obtained by Kloth through his own fraud. The burden was upon his wife to establish that she purchased in good faith and for value without notice of her husband's fraud. (*Garritson* v. *Bray,* 277 Ill. 158.) No such proof has been made.

Appellants are entitled to relief. The decree of the circuit court is reversed and the cause is remanded to that court, with directions to enter a decree setting aside the deeds from Mrs. Brainard to Frank Kloth and from Frank Kloth to Grace Kloth. The decree should also provide that Kloth holds the title to the 130 acres in Oklahoma and direct re-conveyance thereof to the heirs-at-law of the deceased, Jennie Brainard. Kloth should be ordered to restore to the complainants the Rollin T. and Clara E. Martin mortgage in the principal sum of $4500 and the fifty-six shares of stock in the Keystone Steel and Wire Company, and in the alternative there should be a personal money decree therefor rendered against Frank Kloth.

*Reversed and remanded, with directions.*