CLAIRE E. SOURS, guardian of property of Elsie May Bower, appellee, v. BERNICE KINNEY COLVIN, appellant.

No. 48173.

(Reported in 55 N.W.2d 462)

November 11, 1952

Zastrow, Noah & Smith, of Charles City, for appellant.

Boyd G. Hayes and Larson & Carr, all of Charles City, for appellee.

SMITH, J.—The vendor was Elsie May Bower. We shall refer to her as plaintiff though the guardian of her property has been substituted.

The contract is dated October 5, 1950. By its terms plaintiff was to sell defendant a described quarter section of Floyd County land (near Marble Rock) which included plaintiff's homestead. The stated consideration was $24,000 to be paid by

assumption of a $5000 mortgage, and payment of the $19,000 balance in annual installments of $1000 each, without interest.

There was at the time a $3000 mortgage on the land which was increased to $5000. Defendant was to pay interest on the additional $2000 until March 1, 1952, when possession was to be given, and thereafter on the whole sum of $5000. (This latter provision was added October 9, after the mortgage had been increased to $5000.) There were provisions regarding abstract, insurance, taxes, improvements, etc., not necessary to set out here.

The same day the contract was executed plaintiff made her will giving ("my friends") defendant and one Louise Peterson certain premises in Marble Rock, "by reason of the many acts of kindness shown to me" by them. These ladies were named executrices without bond and also as trustees of a $500 trust fund. There was a devise of another property in Marble Rock "to my friend, Oliver Thorson" and there were various legacies, one for $2000 to a brother, Frank Nicholson, one for $500 to a nephew, two for $500 each to friends (one of these in trust already referred to) and six for $100 each to two brothers-in-law, a grand-nephew, another woman friend, and two charitable institutions. There was also given the sum of $200 for perpetual care of cemetery lot in each of two cemeteries.

The will provided that any unpaid installments on the contract "due and payable up until the time this estate is settled shall be turned in to my estate and used for the purposes *therein* [sic] mentioned." Payments thereafter, if any, were to go to Oliver Thorson in trust, to be used "for the uncompleted payments of any bequests" if necessary and any balance thereafter "deducted from the said contract of Bernice Kinney Colvin to be used and applied by her for the betterment and improvement of the said lands described in said contract." Both defendant and Mrs. Peterson were present when the will was dictated.

There was no residuary clause but there was a provision directing (in case of insufficient funds) proportionate payment of bequests out of the "sums available therefor." We have described the will in detail as a part of the situation existing when the contract was executed, the two instruments being practically parts of the same transaction.

Plaintiff was seventy-five years old, a widow, and childless, so far as the record shows. It is not entirely clear how she was carrying on the farm. One witness testified he rented the south twenty-two acres in 1949 and that the rest was rented to Mr. Boyce. Boyce testified he farmed part of her farm in 1948, 1949 and 1950. Plaintiff testified defendant rented about forty acres of it in 1950. Another witness, Mr. Sweeney, and his wife lived on the farm at the time of the trial, occupying a part of the house ("We have three rooms downstairs and three rooms upstairs"), but that was in 1951. He said he bought two dairy heifers of her in September 1950. An old-age pensioner lived with her.

Defendant was fifty-eight years old, lived in the country west of the town of Marble Rock and not far from the Bower home. She gave music lessons on the piano. She says "I have been friendly with Mrs. Bower practically all my life and particularly friendly since her husband's death" (November 1948); also, "I saw her more than any of her friends in 1950."

Plaintiff, apparently confused, first testified she had known defendant "perhaps ten years"; but on cross-examination she said: "I have known Mrs. Colvin since she was a real small child."

Louise (Mrs. Fred) Peterson (sixty-one) also named in the will, lived one-half mile west of Marble Rock. She "went to school to Mrs. Bower" and describes herself as "a lifelong friend." She says: "The last three or four years Mrs. Colvin, Mrs. Bower and myself have associated together a good deal. * * * [We] would take trips together and ride in my automobile. I had never heard a conversation between Mrs. Colvin and Mrs. Bower about the sale of this real estate until the day we went to Nora Springs."

The instruments were drawn by E. C. Moody, a lawyer and banker in Nora Springs. But before that at least four trips (July 26, August 1, August 3, and October 4, 1950) had been made to attorney Eggert of Charles City in regard to drawing a will. Defendant and Mrs. Peterson accompanied her each time. Mrs. Peterson did not sit in on the conferences with Mr. Eggert but says defendant and plaintiff would go with Mr. Eggert into the back room. Mr. Eggert drew a will which plaintiff did not execute. She took it home to examine and ponder and it was

destroyed by Mr. Moody on October 5 when he drew the contract and will.

The record does not satisfactorily explain the reason for change from attorney Eggert to attorney Moody. Plaintiff cryptically says: "He [Eggert] confronted me with a certain question every time and I was dissatisfied." Defendant says: "Mrs. Bower wouldn't tell Mr. Eggert that she was selling me the farm, and that was the reason why he didn't want to fix the will like she wanted him to."

Before all these events plaintiff's attorney had been Mr. Sullivan of Rockford. He had drawn her will and had it in his possession. On one of the Charles City trips the ladies stopped and got it from him.

Plaintiff did not know Mr. Moody. Defendant suggested him to her and they made one prior trip to Nora Springs (September 22) to see him but he was out of town that day. He had never done legal work for defendant but she had done business at his bank for eight or ten years. She told plaintiff "he was a good man." The first trip to see him was made (September 22) before the final session with Mr. Eggert (October 4) at which time Eggert drew the proposed will that was never executed. This proposed sale of the farm was never mentioned to Eggert.

There is no very clear account in the record as to the negotiations which preceded execution of the contract. Plaintiff thinks the subject was first broached in the latter part of June: "She said that she would buy the farm I owned. She said she would do just exactly as I would want it * * * So it ran along a long while before I answered. * * * Q. How often, about how often did she talk to you about it * * * A. Oh, not so very often, just occasionally. Not every time she came."

Defendant told about a conversation on May 1 in which plaintiff expressed an intention of selling the farm because it was getting too hard to look after it. "Nothing was said about me buying it * * * But on May 10 they sat in defendant's car and talked after being at the club together. "I told her if she was going to sell the farm I would surely like to buy it. She said 'I would surely like to have you have it.' Nothing was said about terms. * * * In July she told me she would sell me the farm. She said that she wanted a thousand dollars down and a thousand

dollars a year without interest. I didn't say anything. I did a lot of thinking. * * * After that we talked most every time I went over. * * * She didn't want very much down because she didn't want to pay the state anything or have any income tax."

They talked with Mr. Cutler in the Moody bank on their first trip to Nora Springs when they missed Mr. Moody but there is no testimony there was any agreement on terms and details before the session with Mr. Moody.

During their various trips plaintiff, according to her testimony, "was broken out" with the shingles "on her chest and shoulders." Her doctor speaks of applying lotion to her skin "where it was broken out around her waist." He was a witness ·for defendant as to plaintiff's soundness of mind but on cross-examination says, "I treated her prior to September 1950. She had mild heart trouble. She aged right along during the summer of 1950. * * * She had diarrhea several times during the summer and fall." On November 24 she had a stroke. On November 14 she was at the doctor's office with defendant. He had been out to plaintiff's house on November 11.

While the doctor testified she was technically of sound mind, it is clear her physical and mental condition was not good. Several witnesses who saw her frequently testified to her failure at times to recognize them during the summer and early fall of 1950. Her husband's grandnephew, Claire E. Sours, said: "On October 1st my wife and I were there probably half an hour. * * * I would say Mrs. Bower was a very sick woman. She wouldn't have been in any condition to do any legal business." Mrs. Sours testified: "Mrs. Colvin was there * * *. We walked in the door and over to Mrs. Bower, and she didn't recognize me. She said 'who are you?' "

Mr. and Mrs. Kieth made weekly delivery of milk to plaintiff. Mr. and Mrs. Reed lived on a farm adjoining plaintiff's. They all testify to her weakened physical and confused mental condition during the summer and fall. There was, of course, testimony of others who saw her and testified she was of sound mind. George Boyce who had rented part of her land for several years gave similar testimony.

Plaintiff testified to an oral understanding, preceding execution of the contract, concerning a right of cancellation: "* * *

she [defendant] said 'you are sick' * * * 'I want a contract', but she said 'if you get better you can have it back any time you want it, any time you want it', and we went on down to Mrs. Peterson's * * *. That was the day we went to Mr. Moody's office."

Defendant denies this conversation but on cross-examination says: "On the morning of October 5th Mrs. Bower said she thought maybe she wouldn't sign any farm papers that day. * * * We went from Elsie's to Mrs. Peterson's. Mrs. Bower, when we left her place, wasn't going to sign any farm papers that day." Nevertheless, according to her same cross-examination: "Elsie did not know Mr. Moody before that. I introduced Mr. Moody to Mrs. Bower and Mrs. Peterson. We all sat down together and Mrs. Bower said she wanted to draw a contract and her will. The terms of the contract were put together in my presence. She talked about her will and the terms thereof in my presence. I knew the provisions of the will."

There are other circumstances and considerations which will be referred to as we proceed. The trial court rendered decree for plaintiff based on a finding of her mental weakness due to age and illness, absence of separate independent legal or other advice to plaintiff, undue influence of defendant and on the unconscionable character of the contract.

I. The case exemplifies an unusual combination of the various elements that appeal to a court of equity, no one of which standing alone would be sufficient under this record to justify cancellation. The remedy of cancellation is not one of absolute right but depends on the sound discretion of the court, exercised in the light of general equitable principles. 12 C. J. S., Cancellation of Instruments, section 3; 9 Am. Jur., Cancellation of Instruments, section 5.

Confidential relationship is not restricted to any particular association of persons. It exists whenever there is trust and confidence, regardless of its origin. 17 C. J. S., Contracts, section 132; Commercial Merchants Nat. Bk. & Tr. Co. v. Kloth, 360 Ill. 294, 302, 196 N.E. 214, 218.

"The character and duty of the relationship are immaterial. They may be legal but not necessarily so. They may be

social, domestic or personal, and their origin is wholly immaterial. * * * Where one voluntarily assumes the confidential relation towards another, he will not be permitted * * * to deal in the property of the opposite party for his own pecuniary profit." Commercial Merchants Nat. Bk. & Tr. Co. v. Kloth, 360 Ill. 294, 302, 196 N.E. 214, 218.

The record is replete with testimony as to the unusual intimacy of association between plaintiff and defendant. Defendant's 1950 diary, from which she refreshed her memory while testifying, contains significant evidence of the closeness of their friendship. Forty-five entries for the six-month period from April 10 to October 9 referred to some contact between them.

It is fair to say the entries show no sordid relationship on the part of either. A few relate to the fact that defendant leased a part of plaintiff's land that summer. Many, probably most of them, tell of mere friendly intercourse—much of it consisting of kindly and thoughtful acts of defendant toward her older friend. But these entries emphasize what is otherwise apparent throughout the record—the intimate friendly relationship between the ladies.

As early as the fall of 1948, after the funeral of Mr. Bower, defendant told Claire E. Sours, Mr. Bower's grandnephew, that it would not be necessary for him to come out there any more "because she was going to take care of Elsie May."

The relationship between the parties, while not directly indicating any particular dependence of plaintiff upon defendant in business matters, nevertheless was such as to establish confidence and reliance tending to preclude any transaction between them at arm's length. It is not necessary to impute dishonest motives to defendant. But considering plaintiff's age, her undoubted frail physical condition, her tendency to be confused mentally at times and the fact that she was without any independent legal or business advice, the instruments being drawn by an attorney entirely strange to plaintiff, of defendant's selection, we must conclude the burden is on defendant to show the entire fairness of the transaction.

The language in Wilkie v. Sassen, 123 Iowa 421, 424, 99 N.W. 124, 125, is in point here: "It is true, as indicated in the authorities cited by appellant, that mere weakness of intellect

in a party to a contract will not of itself be sufficient to justify a decree setting it aside; but when that weakness is shown, and it further appears that by reason thereof such party has been led into a grossly improvident or disadvantageous contract, it requires a much less showing of active fraud in the other party to invalidate it than would be necessary where the parties stand upon a more equal footing."

See also Stout v. Vesely, 228 Iowa 155, 157, 290 N.W. 116, 117, where it is said: "The doctrine arises from the very conception and existence of a fiduciary relation, and in every transaction in which the superior party obtains a possible benefit, equity raises a presumption against its validity and casts the burden of proving affirmatively its compliance with equitable requisites, upon the party receiving the possible benefit."

II. The terms of the contract and testimony as to the value of the property are significant. The price fixed was $150 per acre but it was not a cash transaction. There was even no down payment by defendant. Though she insisted on considering the additional $2000 as such she did not even sign the note when the existing $3000 indebtedness was increased to $5000.

Furthermore there was persuasive testimony that even had it been a cash transaction, the price was substantially inadequate. Two witnesses for plaintiff place its value at $200 per acre, another at $190, one at $190 to $200, two at $175 to $200, and three others at $175, $160 and $155 respectively. For defendant, Attorney Moody said $125 to $150, a Charles City real-estate man $135, and a county supervisor with the "farmer home administration" placed its value at $17,000, frankly basing his opinion on "the earning capacity of the farm."

We have examined the testimony of these witnesses and their knowledge of the premises. We are persuaded the cash value far exceeded the $24,000 which defendant conditionally agreed to pay over a nineteen-year period *without interest*. We say "conditionally" in view of the provision of plaintiff's will, contemporaneously executed, which might have substantially reduced the total amount to be paid below the contract price.

Courts have been careful not to limit by definition the area of equitable power to cancel contracts where the parties are

unequal in situation and the fact has operated to the advantage of the dominant personage.

More readily will the power be exercised where, as here, it can be done without hardship or injustice to one who may have acted without actual intent to overreach. The decree here requires return to defendant of the interest she has paid on the mortgage pursuant to the terms of the contract.

We think the decision of the trial court should be affirmed and it is so ordered.—Affirmed.

All JUSTICES concur.