(No. 29270.—

ELIZABETH STEWART *et al.*, Appellants, *vs.* JOSEPH SUNAGEL, *et al.*, Appellees.

*Opinion filed May 21, 1946—Rehearing denied September 12, 1946.*

LOUIS L. GOULD, and STEPHEN LEE, both of Chicago, for appellants.

JOHN W. TAUCHEN, HAROLD L. REEVE, and ROBERT W. MARRIOTT, JR., all of Chicago, for appellees.

Mr. JUSTICE WILSON delivered the opinion of the court:

On October 2, 1943, August Sunagel, a widower, conveyed an improved parcel of property in Chicago to a nominee, Fred Holzrichter, who, in turn, executed a warranty deed dated two days later to Sunagel, his son, Joseph, and the latter's wife, Eva, as joint tenants. The deeds were caused to be placed of record on October 8, 1943. Thereafter, on February 29, 1944, August Sunagel, then sixty-nine years of age, died intestate. He was survived by six daughters and four sons as his heirs-at-law. May 29, 1944, the plaintiffs, Elizabeth Stewart and four other daughters of the decedent, and three sons, filed an amended complaint in the superior court of Cook county against the defendants, Joseph and Eva Sunagel, the sixth daughter, Myrtle Lewandowski (now Schnur), and Holzrichter. The relief sought was the cancellation of the two deeds, an accounting by Joseph Sunagel, and an injunction restraining him and his wife from further prosecution of a forcible detainer action against Elizabeth Stewart. Plaintiffs charged mental incapacity of the grantor, and perpetration

of fraud and the exercise of undue influence by Joseph Sunagel. The latter and his wife answered, denying the material allegations of plaintiffs' pleading, and filed a counterclaim seeking the entry of a decree affirmatively finding title to the property in themselves, as joint tenants, and directing Elizabeth Stewart to vacate the premises. Myrtle Lewandowski interposed a disclaimer to both the amended complaint and defendants' counterclaim. The cause was referred to a master in chancery who recommended dismissal of the amended complaint, and that an accounting be taken between Joseph F. and Eva Sunagel and Elizabeth Stewart. Objections to the master's report were overruled and ordered to stand as exceptions. The chancellor overruled the exceptions, approved the master's report, and entered a decree in accordance with its recommendations. Plaintiffs prosecute a direct appeal, a freehold being involved.

The decisive issue made by the pleadings and presented for decision upon this appeal is whether a fiduciary relation existed between the grantor of the deed to the property in controversy and his son, Joseph. In 1923, August Sunagel and his wife purchased a vacant lot at 4818 Argyle Street, in Chicago. They borrowed $300 from their daughter, Elizabeth Stewart, to make part payment. This loan has long since been repaid. Sunagel bought a portable garage from a lumber company and, assisted by a friend, his son, Joseph, and a younger son, William, then fifteen years of age, assembled and erected the garage upon the lot in September, 1923, and converted it into a four-room dwelling which Sunagel and his family occupied. Joseph, William, and a son-in-law, Arthur Boberg, assisted with excavating and laying the foundation for a permanent home. Sunagel then purchased an old house several miles distant and, with the aid of Joseph, wrecked it, removed the parts to 4818 Argyle Street, and the family dwelling, consisting of a one-story basement and attic frame build-

ing, was constructed by Sunagel, his sons, Joseph and William, Boberg, and a friend. The work was done in spare time, evenings, Saturdays, Sundays and holidays, over a period of about six months. Joseph did the carpentry work, and rendered more assistance with the construction of the building than anyone else. Additions, improvements, and repairs to the house over a period of twenty years, according to William Sunagel and a neighbore, were made largely by Joseph.

Sunagel's wife died in 1940, and title to the property became vested in him, as the surviving joint tenant. He continued to live at his home with his daughter, Dorothy Boberg. Later, a relative, Bertha Pittelkau, managed the household, and later still, Elizabeth Stewart, with her four children and a stepchild, resided with her father for approximately two and one-half years. During this time, Mrs. Stewart was employed. Sunagel paid her ten dollars weekly to apply on the cost of his meals. She did not pay any rent, but her testimony is to the effect that she paid the gas and electric bills and, also, insurance. This arrangement continued until approximately two months before Sunagel died, when his daughter, Elizabeth, quit preparing his meals for him. Thereafter, he repaired to the home of Bertha Pittelkau for his principal meals, or prepared them himself. Increasing dissatisfaction with the arrangement between his daughter and himself resulted, in February, 1944, in Sunagel advising her she would have to move on the first day of May, 1944. In the meantime, Sunagel's health became impaired, and hospitalization and medical treatment were necessary during the three and one-half years subsequent to his wife's death. The testimony of two physicians who attended him between 1940 and the day of his death, and of his children, with respect to his physical condition and mental faculties, is all to the effect that he was mentally competent, despite a deterioration physically. In August, 1943, Sunagel suffered a heart

attack, incapacitating him to such an extent that he was able to do but little, if any, work. Joseph provided special diet for his father after his illness in the summer of 1943, and it appears that, during this period, August Sunagel ate many meals at Joseph's home.

In September, 1943, Sunagel sold his automobile for $650. He left the proceeds of the sale with a person who delivered the money to him in instalments. There is no evidence in the record that Joseph received any of this money, or any money in his father's possession at the time of the latter's death.

The evidence discloses that a friendlier relationship obtained between Sunagel and some of his ten sons and daughters than with others. According to Joseph, a confidential relationship obtained between his father and himself, but the conclusion is warranted that he was not employing the expression "confidential relationship" in a legal sense. After the conveyance of the property in 1943, Joseph did not attempt to exercise dominion over the property, and did not inform his brothers and sisters of the transaction prior to their father's death. Joseph had a key to his father's bedroom and other keys to the basement and the front door. William Sunagel's wife testified that Joseph told her he wanted his father to feel the house belonged to him as long as he lived.

Frieda Wendland, a sister of August Sunagel, testified that, in a conversation with her brother in August, 1943, he informed her that he was going to place the property in joint tenancy with his son; that he wanted Joseph to live there, take care of the property, keep it in repair, and that he was going to live with him. Loretta Wendlund, a daughter-in-law of Frieda Wendlund, corroborated her mother-in-law. Bertha Pittelkau testified that Sunagel talked to her concerning the property, told her he was going to will it to Joseph and, later, informed her, "It is all taken care of. Joe is going to be the owner of the building with

me." Elsie Walton, a near neighbor, testified that, in the fall of 1943, Sunagel told her he desired to give Joseph the house, and then live with his son because he was the only one who ever did anything "on the home," or for him, and that he wanted Joseph to move into the house and live with him. She added that Joseph took him wherever he wanted to go and administered to his wants at home.

Additional circumstances merit mention. William Sunagel testified that, in the last few months of his father's life, Joseph was present whenever possible to take him riding in his (Joseph's) automobile. George Sunagel testified that his father's income during the last months of 1943 consisted solely of social security benefits and such money as his children gave him, and that he personally gave him ten dollars and, in November, 1943, an insurance policy on his (George's) life. Elizabeth Stewart testified that Joseph did not come to the house very often prior to August, 1943. She stated, however, that Joseph furnished automobile transportation for their father after the sale of his own car. Eva Sunagel testfied that her husband went to see his father every morning for about a year before his death.

Can it be said that plaintiffs proved the existence of a fiduciary relationship between Joseph Sunagel and his father? A fiduciary relation, it is settled, does not obtain between a parent and a child as a matter of law. It must be established by competent evidence. (*O'Malley* v. *Deany*, 384 Ill. 484.) Again, the burden of proving facts from which a confidential or fiduciary relationship arises rests upon the parties seeking to set aside a conveyance. To establish the relationship by parol evidence, the proof must be clear, convincing and so strong, unequivocal and unmistakable as to lead to but one conclusion. (*McGlaughlin* v. *Pickerel*, 381 Ill. 574; *Johnson* v. *Lane*, 369 Ill. 135.) With respect to undue influence sufficient to require setting aside a deed, the undue influence must go to the extent

of depriving the grantor of his free agency and must operate at the time of the transaction sought to be impeached. Here, again, the mere fact of family relationship between parent and child does not, where a parent is the grantor and the child is the grantee, raise any presumption of undue influence, but in such case there must be proof of fraud or undue influence, as a fact, in order to void a deed challenged on these grounds. *Kasbohm* v. *Miller,* 366 Ill. 484.

Construing the evidence most favorably to plaintiffs, it cannot be said that, as a matter of fact, a fiduciary or confidential relationship obtained between August Sunagel and his son, Joseph. Nor would a concession that such relationship existed avail plaintiffs since the evidence discloses no overreaching at any time on the part of Joseph in his relations with his father. Plaintiffs themselves practically concede that Joseph's statement to the effect of a confidential relationship existing between them is not to be construed in its legal connotation of a fiduciary or confidential relationship. The evidence adduced demonstrates, without question, that the grantor was in frail health for approximately six months prior to his death but, at the same time, that he retained his faculties to the day he died. Again, he favored his son, Joseph, over his other nine children. This may have been unwise, and has certainly promoted a family quarrel. The fact remains, however, that the property in controversy belonged solely to the grantor, Sunagel, prior to October, 1943, and that he could dispose of it in his lifetime, or by will upon his death, in an unequal manner if he chose so to do. The testimony of relatives and friends demonstrates, beyond doubt, that Sunagel desired to so place title to the property that, upon his death, it would go to Joseph and the latter's wife, as joint tenants. He expressed his wishes in this regard both prior and subsequent to the conveyances assailed. A careful examination of all the evidence fails to disclose the existence of a

confidential relationship, in fact, between the parties to the deeds, by which Joseph Sunagel and his wife took advantage of the grantor. A degree of favoritism on the part of the father to his son, Joseph, falls far short of evidence even tending to show that undue influence on the latter's part induced the execution of the deeds. Evidence of fraud on the part of Joseph and his wife is utterly lacking, and, finally, the grantor was mentally capable of making such disposition of his property as he saw fit.

The contention that the transaction attacked is void as an attempted testamentary disposition of the property is not well taken. The deeds to the property were recorded in due course, and there is ample evidence that the grantor understood thoroughly their nature and legal effect; that he desired his son, Joseph, to come to live with him at once; that Joseph had keys to his father's room, the basement, and the front door and, further, that about three weeks before his death Sunagel directed his daughter, Elizabeth, to vacate the property on May 1, 1944.

The decree of the superior court of Cook county is affirmed.

*Decree affirmed.*