## VARGAS v. ESQUIRE, Inc.

### No. 9209.

Circuit Court of Appeals, Seventh Circuit.

Feb. 27, 1948.

Rehearing Denied April 12, 1948.

MAJOR, Circuit Judge, dissenting.

See, also, 7 Cir., 164 F.2d 522.

Edward R. Johnston, James A. Sprowl, and Alan R. Johnston, all of Chicago, Ill. (Poppenhusen, Johnston, Thompson & Raymond, of Chicago, Ill., of counsel), for appellant.

Earle E. Ewins and Edward S. Price, both of Chicago, Ill. (Musgrave, Ewins, Price & Notz, of Chicago, Ill., of counsel), for appellee.

Before SPARKS, MAJOR, and KERNER, Circuit Judges.

KERNER, Circuit Judge.

Plaintiff, a citizen of Illinois, brought this action against defendant, a Delaware corporation, to cancel and set aside a contract entered into between the parties. The case was tried by the court without a jury. The trial judge made special findings of fact. He concluded as a matter of law that at the time of the execution of the contract a relationship of special trust and confidence existed between plaintiff and Smart (defendant's agent) and entered a decree setting aside and cancelling the contract. To reverse the decree, defendant appealed.

Three questions are presented. First. Did a confidential relationship exist between the parties? Second. Was plaintiff induced to sign the contract by some deception or fraud on the part of defendant? Third. If there was fraud in the procurement of plaintiff's signature, did plaintiff's performance of the contract from May 23, 1944 to January 10, 1946, without objection, constitute an election to affirm the contract. In the view we take of this case it will not be necessary to discuss the third question.

First. It is true that when the existence of a fiduciary relationship has been established the law casts the burden

upon the dominant party to produce evidence of good faith and fair dealing, but equity has not set any bounds to the facts and circumstances out of which a fiduciary relationship may arise, and each case must stand or fall on its own facts. The relationship is not confined to any specific association of the parties, and the origin of the confidence and the source of the influence is immaterial, and no special character or relationship is necessary as a matter of law. The relationship arises wherever the circumstances make it certain that confidence was reposed on one side and domination and influence resulted on the other. But where a fiduciary relationship does not exist as a matter of law, the burden of proving facts from which such a relationship arises is upon the person seeking to establish the relationship, and the proof must be clear, convincing, and so strong as to lead to but one possible conclusion. Stewart v. Sunagel, 394 Ill. 209, 68 N.E.2d 268; Finney v. White, 389 Ill. 374, 59 N.E.2d 859; Johnson v. Lane, 369 Ill. 135, 15 N.E.2d 710; Seely v. Rowe, 370 Ill. 336, 18 N.E.2d 874; and Commercial Merchants National Bank & Trust Co. v. Kloth, 360 Ill. 294, 196 N.E. 214.

With these rules in mind, we have examined the record so as to ascertain whether it contained sufficient evidence to warrant a conclusion that a fiduciary relationship existed between the parties. Our study has convinced us that there was nothing in the relationship of the parties to raise any presumption of a domination by Smart over Vargas or that Smart had acquired an influence and superiority over Vargas which he abused.

Plaintiff, an artist, fifty-one years of age, is a native of Peru. He left Peru at the age of seventeen. From 1912 to 1916 he resided in continental Europe, and since 1916 he has resided in the United States. He came to Chicago in June, 1940. Defendant is engaged in the business of publishing magazines, calendars, and other printed matter. David A. Smart is its president and all of plaintiff's dealings concerning the contract were carried on with David A. Smart as defendant's agent.

In June, 1940, Vargas, then a little known artist, after a conference with Smart, entered into an employment contract with defendant, by which he agreed to furnish defendant with certain art material for use in magazines published by Esquire and for use by it. The contract covered a period of three years, commencing July 1, 1940, with an option to defendant of extending the agreement for an additional period of three years upon giving Vargas ninety days' notice prior to such date. The contract fixed Vargas' salary at $75 per week, payable monthly, and provided additional compensation of 5% of the net receipts of Esquire from sale or other disposition of art work produced by Vargas which was sold or exploited by Esquire for commercial purposes. In case Esquire exercised its option to extend the contract, the basic salary of Vargas during such extended period was to be $150 per week and 60% of the net receipts from outside sources.

The defendant failed to exercise its option to extend this contract but Vargas continued in the defendant's employ without a contract upon a basis mutually satisfactory until May 23, 1944, when a second contract was entered into. This is the contract involved in this appeal.

Briefly, the controlling facts shown from all the evidence were that Vargas was an artist in whom Smart was interested; that as a friend he advised Vargas and his wife (a native born American who handled his business affairs) as to their place of abode and the furnishing of their apartment; that Smart visited Vargas' home and had defendant advance such money as they might need to furnish their apartment and which they might from time to time require for various purposes; that Vargas believed in the honesty of Smart; that Vargas was given attention and supervision so as to make sure that his pictures were the best to be obtained from him; that efforts were made to see that he might work and live in agreeable and pleasant surroundings which would help him to work and enhance his prestige as an artist; and that Smart did what he reasonably could to satisfy the wants and desires dictated by Vargas' artistic temperament.

But belief in the honesty and integrity of a close and intimate friend, Bordner v.

Kelso, 293 Ill. 175, 127 N.E. 337; Higgins v. Chicago Title & Trust Co., 312 Ill. 11, 143 N.E. 482, or the existence of an employee-employer relationship, Doheny v. Lacy, 168 N.Y. 213, 61 N.E. 255; Renshaw v. Tracy Loan & Trust Co., 87 Utah 364, 49 P.2d 403, 100 A.L.R. 872, or debtor-creditor relationship, Guffey v. Washburn, 382 Ill. 376, 46 N.E.2d 971, or trust alone, is not sufficient to establish the relationship, Hancock v. Anderson, 160 Va. 225, 168 S.E. 458. Upon this state of the record it cannot be said as a matter of law that Vargas has established the existence of a fiduciary relationship by the proof required by the law applicable to such cases.

▆▆▆ Second. We now consider what we think is the turning question in the case, that is, whether the contract is void because plaintiff failed to know what it contained. It is clear from this record and the findings of the court that Vargas understood that he was signing a contract fixing the terms and compensation under which he was to furnish pictures for defendant and that Vargas knew that Smart was representing defendant as its agent in executing the contract. There are but six paragraphs in the contract. It is written in plain and ordinary language and is readily understandable.

It is a rule universally recognized that a written contract is the highest evidence of the terms of an agreement between the parties to it, and it is the duty of every contracting party to learn and know its contents before he signs it. And in the absence of fraud, which must be proved by clear and convincing evidence (Bundesen v. Lewis, 368 Ill. 623, 15 N.E.2d 520), a man in possession of all his faculties, who signs a contract, cannot relieve himself from the obligations of the contract by saying he did not read it when he signed it, or did not know or understand what it contained. Upton v. Tribilcock, 91 U.S. 45, 50, 23 L.Ed. 203. To be sure, if his signature is secured by some fraudulent trick or device as to the context of the contract, which prevents him from reading the agreement, he may by proper action avoid the contract. Ford Motor Co. v. Pearson, 9 Cir., 40 F.2d 858, 867. But the contract cannot be avoided by

proof that one of the parties, if he was sound in mind and able to read, did not know the terms of the agreement. One must observe what he has reasonable opportunity for knowing; the law requires men, in their dealings with each other, to exercise proper vigilence and give their attention to those particulars which may be supposed to be within reach of their observation and judgment and not to close their eyes to the means of information which are accessible to them. A person is presumed to know those things which reasonable diligence on his part would bring to his attention.

In the instant case the evidence showed and the court found that Vargas had resided in the United States since 1916; that "he writes English very well, speaks good English"; that "Vargas and his wife were both capable of reading and understanding the English language at the time of the execution of the contract"; and that "prior to the signing of the contract the plaintiff was requested * * * to read the contract, and both the plaintiff and his wife had an opportunity to read the contract."

▆▆▆ At this point it is worthy of note to say that the record discloses that at the time Vargas repudiated the contract the only terms objected to were those pertaining to his salary and the number of pictures required. In such a situation, after litigation had begun, Vargas could not change his ground. Railway Co. v. McCarthy, 96 U.S. 258, 24 L.Ed. 693; Danberg v. Langman, 318 Ill. 266, 149 N.E. 245.

There is no dispute over the circumstances surrounding the execution of the contract. Vargas testified that Smart read the contract to him, down to the beginning of the third paragraph, and then—

"he [Smart] turned to me and he said, 'You can go over there [to a desk or table in the room] and check up on what I say,' so he handed me these papers [the contract in question] and * * * I got those papers, and I sat down * * * to see *what was what.* [Emphasis added.]

"The first thing that I saw was $18,000, and that was what he had promised me, * * * and then I saw twenty-six pic-

tures. * * * And then there was a bonus of * * * $1,500, and a percentage of the calendar, that comes to one-quarter, on the calendar."

In this situation, there can be no question but what Vargas had ample opportunity to read and consider the contents of the contract.

It is a well settled rule of law that when a party to a contract is able to read and has the opportunity to do so, he cannot thereafter be heard to say he was ignorant of its terms and conditions. Chicago, R. I. & P. R. v. Hamler, 215 Ill. 525, 74 N.E. 705, 1 L.R.A.,N.S., 674, 106 Am, St.Rep. 187, 3 Ann.Cas. 42.

The court, as we have already observed, found as a fact that Smart had read the contract to Vargas, down to the third paragraph [1] (Vargas does not claim that Smart misread the first two paragraphs of the contract, or that Smart misrepresented the contents thereof), and Vargas testified that he had been handed the contract for the purpose of checking up on what Smart had read and of seeing "what was what"—that is to say, what were actually the terms and conditions of the contract. True it is, the evidence showed a friendly relationship between Vargas and Smart. The mere fact that Vargas and Smart were friendly did not establish a fiduciary relationship. Finney v. White, supra, 389 Ill. 379, 59 N.E.2d 859. The evidence fell far short of proving bad faith or fraud on the part of Smart. On the contrary it proved beyond a doubt that all the terms and conditions of the contract had been revealed to Vargas and that Vargas had not been induced to sign the contract by any deception or fraud on the part of Smart; It did not prove that any confidence had been reposed in Smart by Vargas or that Smart had dominated or influenced Vargas; rather, the facts lead inescapably to the conclusion that Vargas was making an independent examination of the terms and conditions of the contract and that Vargas placed no reliance on what Smart had said or might have said.

But there is even more to be considered upon the question we are now discussing. Vargas testified that prior to the execution of the contract he had been

[1] The first two paragraphs of the contract provide as follows:

"1. Vargas agrees for a period of ten years and six months, beginning January 1, 1944, as an independent contractor, to supply Esquire with not less than twenty-six (26) drawings during each six-months' period. Vargas will endeavor to make said drawings satisfactory to Esquire and of a quality and standard comparable to the drawings which have heretofore been furnished by Vargas to Esquire. The drawings so furnished, and also the name 'Varga', 'Varga Girl', 'Varga, Esq.', and any and all other names, designs or material used in connection therewith, shall forever belong exclusively to Esquire, and Esquire shall have all rights with respect thereto, including (without limiting the generality of the foregoing) the right to use, lease, sell or otherwise dispose of the same as, it shall see fit, and all radio, motion picture and reprint rights. Esquire shall also have the right to copyright any of said drawings, names, designs or material or take any other action it shall deem advisable for the purpose of protecting its rights therein.

"2. In consideration of the drawings so furnished and of the other rights herein given to Esquire, Esquire shall pay to Vargas the following amounts, namely: Eighteen Thousand ($18,000) Dollars during the first eighteen-months' period beginning January 1, 1944, and during each succeeding eighteen-months' period of the term of this agreement, an amount equal to the amount paid during the next preceding eighteen-months' period, increased by Fifteen Hundred ($1,500.00) Dollars. Payments of these amounts, shall be made to Vargas in equal monthly installments during each eighteen-months' period.

"In addition, Esquire shall pay to Vargas one-fourth (¼) of one per cent (1%) of gross receipts actually received by Esquire from the commercial sale of articles, booklets, reprints, calendars, etc. (exclusive of magazines and similar publications) sold by Esquire during the terms of this agreement, containing reproductions of any drawings furnished to Esquire by Vargas under this agreement. Payment of any amounts based upon gross receipts shall be made semi-annually within three (3) months after the end of each semi-annual period. Any articles given away or distributed by Esquire for promotional purposes shall not be deemed to be sold within the meaning of this paragraph."

told by Smart that a new contract would provide for a fixed salary of not less than $18,000 per year and would require plaintiff to draw not more than 26 pictures each year. Smart denied this conversation. The trial judge apparently gave no credence to Vargas' testimony that Smart had told Vargas that he would be required to draw not more than 26 pictures each year, since the court found as a fact that "Prior to May 23, 1944, neither * * * Smart nor any other representative of defendant made any representations to the plaintiff concerning the specific number of pictures that plaintiff would be required to produce for defendant each year under any proposed new contract."

Moreover, although the trial judge made fifty-five separate findings of fact, he did not find that Smart had at any time made any representations as to what Vargas' compensation would be or how much money Vargas would earn under a proposed new contract. Thus it is clear that the trial judge did not accept Vargas' testimony in this regard and the inference is that Smart did not say to Vargas that the new contract would provide for a fixed salary of not less than $18,000 per year.

We are not unmindful of the fact that the trial judge heard and saw the witnesses and that his decree should not be disturbed unless clearly erroneous; nevertheless, under the circumstances here appearing, measured by the the applicable law, we think the decree is without evidence to support it; hence, it should not be allowed to stand.

The decree will be reversed and the cause remanded to the District Court with instructions to dismiss the complaint. It is so ordered.

MAJOR, Circuit Judge (dissenting).

I know of no other case where the findings of fact made by a District Judge have been so completely disregarded. Defendant argues the case here as though it were being tried de novo, and the majority opinion indicates what the result shows, that it is being heard and decided on the same basis. On a printed record which contains over 700 pages of testimony, oral and documentary, wherein the District Court after hearing oral testimony for seven days made voluminous findings of fact upon which its judgment was predicated, this court now reverses such judgment in an opinion which fails to mention even one of the findings thus made. Rule 52 of the Federal Rules of Civil Procedure, 28 U.S. C.A. following section 723c, provides: "Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses."

Notwithstanding that this is a case particularly appropriate for the application of such Rule, it is brushed aside on the specious basis that this court does not agree with the judgment.

The opinion states, "He [the District Judge] concluded as a matter of law that at the time of the execution of the contract a relationship of special trust and confidence existed between plaintiff and Smart," and later, after referring to certain authorities, states, "With these rules in mind, we have examined the record so as to ascertain whether it contained sufficient evidence to warrant a conclusion that a fiduciary relationship existed between the parties."

Thus, this court treats the vital issue in the case as one of law and overlooks the following finding of fact: "By his acts David A. Smart became and was the friend and adviser of plaintiff as regards his business and domestic affairs and invited and had the special trust and confidence of plaintiff as regards such affairs far beyond the trust and confidence ordinarily existing between men associated in a business as employer and employee."

Even the defendant did not ignore this finding, but argued it was not supported. In its brief it states, "The court's finding of fact that David Smart stood in a fiduciary relation to Vargas is unsupported by substantial evidence and should be set aside."

I recognize the futility of dissent, but in fairness to the District Judge and for the purpose of keeping the record straight, I feel impelled to recite a few of the more salient evidentiary findings upon which the lower court predicated its ultimate finding as to the existence of a fiduciary relation-

ship, none of which are mentioned in the opinion, which are not challenged by the defendant. The court found that during the time plaintiff and his wife resided in Chicago, Smart "was consulted by plaintiff and his wife as regards their places of abode, he visited the apartments they desired to rent, and he was consulted about and advised them concerning the furnishing of their apartments"; that he was a "frequent visitor at the home or apartment of plaintiff"; and that he advised plaintiff and his wife that they might obtain from the defendant "money they might need properly to furnish the different places in which they resided and which they might from time to time require for various other purposes." The court further found that the defendant, in addition to the compensation which it was obligated by contract to pay the plaintiff, advanced to him and his wife large sums of money, including "$5,000.00, advanced in 1943 to bring plaintiff's mother and sister from Peru; $2,250.00, advanced to plaintiff to buy his wife a ring; $728.00, advanced to purchase plaintiff's wife a coat, in addition to the very substantial sums advanced for the decorating and furnishing of the residences of plaintiff and various other purposes." Further, the court found that subsequent to May 15, 1941 "no accounting was ever made by defendant to plaintiff in regard to his account with defendant," and at no time "was any demand ever made for the repayment by plaintiff of any sums advanced by defendant"; further, that "David A. Smart had complete control of the work done by plaintiff for defendant to be sold to others, and plaintiff for his earnings from such work necessarily relied upon and trusted to the judgment of said David A. Smart in regard thereto."

As the court found, for the calendar year 1942 the defendant advanced to the plaintiff the sum of $3,419.29, in addition to the salary and compensation provided by contract. While this amount was charged to plaintiff, no demand was ever made for its payment. For the calendar year 1943, defendant, as found, advanced to the plaintiff the sum of $10,573.12, in addition to his contract salary of $325 per month, and at the end of the year the amount of these advances exceeded the compensation earned by the plaintiff under his contract in the amount of $5,699.80. Included in such advances are the following: January 14, 1943, $1,000; March 12, $473.12; April 14, $500; June 14, $500; June 19, $5,000 (this was the money to bring plaintiff's mother and sister to the United States); November 16, $500, and December 14, $1,600. In addition, Esquire rented a studio for plaintiff during the last six months of this year and advanced the rent of $55 a month.

At the conclusion of the year 1943, a formula was worked out between Smart and other officials of the defendant by which plaintiff was credited on defendant's books with an amount sufficient not only to absorb the advancements which had been made but which showed there was a balance of $565.85 owing to plaintiff. A check was issued to Vargas for this amount, with a voucher attached which showed that it was to balance his account. This formula was worked out, all of plaintiff's indebtedness to the defendant by reason of the advancements which it had made were cancelled, and a balance ascertained to be due the plaintiff, without consulting him and without knowledge on his part.

The court further found that "David A. Smart from the time of the arrival of the plaintiff and his wife in Chicago on or about July 1, 1940, throughout their association with defendant, exhibited an unusual interest in everything pertaining to their life." This is the only evidentiary finding which the defendant mentions in its brief, and as to this it states: "There is no testimony to support so broad a finding."

As to the execution of the contract in suit, the court found, "David A. Smart knowingly withheld from plaintiff information of a material nature and information of such a nature that if known to plaintiff he undoubtedly would not have signed the contract in question," that Smart "knowingly misrepresented to the plaintiff matters of a material nature as regards said contract," and that he did so "with the purpose and intent and in a fashion calcu-

lated to induce plaintiff to sign said contract." The court further found that in the execution of the contract "plaintiff did not act as a free agent," "plaintiff through the acts of David A. Smart was misled," "plaintiff by the acts of David A. Smart was imposed upon," and that "plaintiff while not acting as a free agent signed the contract." The court further found that the contract "is unfair and inequitable as regards plaintiff and in signing the same he acted to his great damage and detriment," and that "plaintiff did not know and understand in many important particulars the contents and provisions thereof." Also, the court found that "If plaintiff had known and understood the contents and provisions of the contract * * * and the truth of the matters misrepresented to him, and of the matters withheld from him by defendant, he undoubtedly would not have signed the said contract."

The record discloses unmistakably that plaintiff and his wife had little knowledge and less concern as to their financial dealings with defendant. Whether their desire or fancy called for a home, furniture, a diamond ring, a fur coat, or the privilege of bringing their relatives to this country, Smart was their financial guardian angel. There is no evidence that he ever refused them. The money thus advanced was charged to plaintiff's account, with never a demand or notice for payment, and at the end of the year the advance was cancelled. This relation standing alone furnishes a solid basis for the confidence and trust which the District Court found and which plaintiff says he reposed in Smart.

A few further circumstances gleaned from this voluminous record may be mentioned. In 1941, Smart informed the plaintiff that all mail addressed to him must come through the defendant's office, that his office must be listed under the same number as the defendant, and that plaintiff should not have his telephone listed. This was to make sure that every offer for outside commercial work would come through Smart. At the same time, he was informed by Smart, "All you have to do is, you have absolute trust in me, that I am doing the best things as I see for you, for your own good. As long as you keep on working and you keep on delivering the stuff that everybody likes, and especially me, I shall make everything within my power to make it possible for you to earn more and more from the work on the outside." At that time plaintiff stated to Smart, "I put all my faith in you. You handle all my business any way you see fit, because I don't know anything about business. I know I am trying to paint pictures the best way, and if you say that my mail and my address and my telephone and all that has to be done through your office it is perfectly all right with me."

In 1944, plaintiff and his wife made a trip to California. Before leaving, Smart made Mrs. Vargas a present of two rings and a brooch. Later in the same year, after their return from California, plaintiff told Smart that the apartment in which they were living was too small. Smart approved the idea that they find a little house in the country and promised to talk to the real estate men to see if a place could be found in Glenview, near where Smart lived. No place was found, and Smart suggested that plaintiff buy land and build a home. Smart told him that he should have a fine house and several cars, and on one occasion accompanied plaintiff and his wife to look at a house. Smart thought the house was too small and persuaded plaintiff not to buy it, although he offered to have Esquire lend plaintiff $13,000.00 cash if a suitable home could be found.

The first contract expired July 1, 1943, and the second contract (the one in suit) was not executed until May 23, 1944, so there was a period of some eleven months during which the parties were not under contract. During this period the relationship of the parties remained the same. The plaintiff never urged or requested a new contract; neither did he request an increase in salary during this period or at any other time. He seemed content to do whatever was requested and to accept whatever compensation the defendant saw fit to pay him. His willingness to continue his work without a contract and without any agreement or understanding as to the compensation he was to receive

during such period is a further significant circumstance in support of the plaintiff's oft-repeated statement that he had faith and confidence that Smart would treat him right.

That Smart recognized that he was something other than a mere employer of plaintiff is illustrated by the autographed photograph which he sent to the plaintiff in 1942, which read:

"To my talented friend Al. Vargas and his good wife Anna May who labored like slaves to perpetuate the Ziegfeld tradition so that Esquire can boast 'Through these pages walk and lie the most beautiful girls in the world.'

"Sincerely—David A. Smart."

The intimate as well as the affectionate regard which plaintiff and his wife entertained for Smart is further illustrated by the fact that they called him "Uncle David." That this appellation was not distasteful to Smart is shown by a telegram which he sent to plaintiff's wife September 14, 1945, signed "Uncle David."

If this record does not support the finding that a relation of special trust and confidence existed between plaintiff and Smart, it would be futile to attempt to make such a record. It is the character of a finding which is peculiarly within the province of the trier of the facts who has seen and heard the witnesses, although I have no hesitancy in expressing the view that I would make the same finding on the record before us. While the relationship had its inception at a time when the plaintiff was an unknown and unheralded artist and was maintained during a period when he became famous, there is no showing and I think no reason to believe that plaintiff made progress in any other field. His knowledge of business, such as finance and contracts, must have been meager in the beginning and was not enhanced during all the time he did business with Smart. The situation did not suggest, much less require, that he pay any attention to such matters. He was an artist and his time and energy were confined to that field. It is doubtful if he had any inclination and certainly no reason to do otherwise, because he had often been assured by Smart that he need not worry or concern himself with financial matters but that they would be taken care of by Smart. It is quite plain that Smart desired plaintiff to devote himself in toto to the production of art. It perhaps is true, as asserted by the defendant, that it was good business on the part of Smart to accord to plaintiff the generous treatment which the record discloses. Such altruistic treatment, however, did not dispel, in fact it succored, the trust and confidence engendered in the plaintiff.

The majority having refused to accept the finding of the District Court that a special relationship of trust and confidence existed between plaintiff and the defendant, there is no occasion to go farther. Evidently this is the vital and controlling issue in the case and the only purpose of this dissent is to enter my protest to what, in my judgment, is a usurpation by this court of a function so clearly lodged in the District Court.