**HOLLY STORES, Inc. v. JUDIE et al.**

No. 9914.

United States Court of Appeals
Seventh Circuit.

Jan. 30, 1950.

William F. McInery, Aaron H. Huguenard, South Bend, Ind., Gerald C. Snyder, Waukegan, Ill., for appellants.

Walter Feldesman, New York City, Geo. N. Beamer, Nathan Levy, South Bend, Ind., S. J. Crumpacker, Sr., South Bend. Ind. (Arthur L. May, R. Floyd Searer, S. J. Crumpacker, Jr., Arthur A. May, South Bend, Ind., of counsel), for appellee.

Before MAJOR, Chief Judge, and KERNER and SWAIM, Circuit Judges.

MAJOR, Chief Judge.

This is an appeal from a decree, entered March 31, 1949, in an action for reformation of a real estate lease bearing date of May 29, 1946, between the plaintiff, Holly Stores, Inc. (hereinafter called Holly), as lessee, and the defendants, James A. Judie and Margaret I. Judie (hereinafter called Judie or Judies), as lessors. The reformation directed was that the figure five hundred forty-two thousand eight hundred fifty-seven dollars and fourteen cents ($542,-857.14) wherever the same appears in said lease be changed to that of six hundred forty-two thousand eight hundred fifty-seven dollars and fourteen cents ($642,857.14).

The sole issue concerns the amount of rent which Holly was obligated to pay to the Judies, and the discrepancy of $100,000 between the figure contained in the lease and that which the court ordered substituted therefor represents the basis for the dispute. In other words, Holly contends that it is liable for a rental calculated on

the reformed figure, while Judie contends that it is to be calculated on the figure contained in the lease.

Inasmuch as the controversy relates entirely to rentals, we need be concerned only with portions of the lease relevant to this issue, and we think a clearer picture of the situation may be obtained by setting forth such portions of the lease in the beginning. The lease provides:

"To Have and to Hold the premises hereby demised unto the Lessee, its successors and assigns from January 1, 1947 to January 1, 1960 for a total guaranteed rental of Four Hundred Ninety-four Thousand and No/100 ($494,000.00) Dollars, together with Seven (7%) Per Cent on Sales (Gross sales less refunds), payable as set forth hereinafter:

"In Consideration of the leasing of said premises to Lessee by the said Lessors, the said Lessee Hereby Contracts and agrees to pay to the said Lessors as the yearly rental for said premises, as follows; to-wit:

"The sum of Thirty-eight Thousand and No/100 ($38,000.00) Dollars, per annum, payable in monthly installments of Three Thousand One Hundred Sixty-six and Two-thirds ($3,166.66⅔) Dollars, per month, in advance on the first day of each and every month from January 1, 1947 to January 1, 1960; together with seven (7) per cent on Lessee's sales (gross sales less refunds) on said premises in excess of Five Hundred Forty-two Thousand Eight Hundred Fifty-seven and 14/100 ($542,857.14) Dollars per annum, which excess shall be payable annually as set forth hereinafter * * *."

Subsequently, the lease sets forth the manner by which Holly is to inform Judie at the end of each year of the amount of its gross sales and "at which time Lessee is to pay Lessors Seven Per Cent (7%) on the amount of Lessee's sales as shown on said statement in excess of the guaranteed rentals; viz., $542,857.14, as mentioned above."

The lease provides, "In Addition to the above payments" the lessee agrees to carry insurance in a specifically stated manner "to be kept and maintained in full force during the entire term of this lease at the expense of Lessee," and that in the event of the failure of the lessee to procure such insurance and "to pay the premium or premiums thereon," the lessors shall have the right and privilege to procure such insurance and to pay such premium or premiums "which amounts shall be deemed so much additional rent, and shall be due and payable with the next installment of rent due thereafter." Further, the lease provides that the "Lessee covenants and agrees to pay, in addition to the rents heretofore specified," all taxes and special assessments assessed or imposed during the term of the lease.

It will be noted that $38,000, the amount of the guaranteed rental, is 7% of $542,857.14, the figure designated in the lease above and on which Holly is obligated to pay 7% in addition to the guaranteed rental. Holly contends, however, that in accordance with a pre-existing agreement between the parties there should be added to the $38,000 guaranteed rental the amount of $7,000, representing taxes and insurance, which though agreed to be paid by Holly was to be charged to Judie as a basis for calculating the amount of gross sales above which it was obligated to pay 7%. Thus, instead of the figure stated in the lease which at 7% will produce $38,000, it seeks a reformation by changing that figure to $642,857.14, which at 7% will produce $45,000 ($38,000 guaranteed rental plus $7,000 taxes and insurance).

We are met at the threshold with the contention that the facts and circumstances attendant upon the execution of the lease in suit, together with its plain provisions, are such that a court of equity should refuse to take cognizance. While it may be assumed, from the fact that it decreed reformation, that the court below decided this issue adversely to Judie, we are of the view that its findings of fact, if accepted, are not decisive of this issue. As a basis for a discussion of this issue we think that neither the evidence nor the court's findings with reference to prior leases or agreements as to negotiations which pre-

ceded the execution of the lease in suit are controlling.

Holly, a New York corporation with its principal office in New York City, is engaged in retailing women's ready-to-wear goods. It operates approximately eighty-five stores in the United States. During the relevant period Leo Kossove was its president and Samuel Liebowitz its secretary, and Robert Weiser, residing at South Bend, Indiana, was supervisor of approximately twenty-five stores operated by Holly in the middlewest section of the United States. Both Kossove and Liebowitz were lawyers, the former having been connected with Holly since its formation in 1932 and its president for more than fifteen years, while the latter had also been connected with Holly for more than fifteen years. Weiser was promoted to vice president of Holly in 1947, and has been continuously employed by it in a supervisory capacity since 1943. He attended law school at Northwestern University for about a year and one-half.

The defendant, James A. Judie, was born in 1865 and was, therefore, 83 years of age at the time of the trial. He, too, was a lawyer but had never engaged in general practice. During most of the past sixty years he has been engaged in real estate, insurance and probate work. The defendant, Margaret I. Judie, is the wife of James A. Judie and had nothing to do with the execution of the lease in suit other than sign it. The lease covered a valuable property in downtown South Bend, Indiana, owned by the Judies. A portion of the property had been leased to Holly by the Judies under two prior leases and had been occupied by Holly in the operation of its South Bend store. The lease in controversy not only covered property which had been included in former leases but additional property adjacent thereto.

Judie prepared two drafts of the lease, the latter of which was executed by the parties. Both drafts contained exactly the same provisions which are now in controversy, that is, those pertaining to rentals. The first draft was delivered to Weiser on May 20, 1946. Weiser, according to his testimony, took the lease by plane to New York, examined it carefully and read the rental provisions, including the figure $542,857.14, and noted that in addition to the cash rental Holly was obligated to pay the insurance and taxes. In New York Weiser delivered the lease to Kossove in his office, who directed that it be taken to Charles Fredericks, general attorney for Holly, for examination. Weiser discussed with Fredericks the figures contained in the lease and told Fredericks that he, Weiser, had checked them. Fredericks, after an examination of the lease, made a number of corrections, none of which had anything to do with the rental provision.

Thereupon, the lease was signed by Kossove as president of Holly and by Liebowitz as secretary. This draft was brought back to South Bend by Weiser. In some respects not here material it was not satisfactory to Judie, who redrafted it to conform to the suggestions made by attorney Fredericks. In its redrafted form it was returned to New York and examined on behalf of Holly by an attorney by the name of Wool, prior to delivery to Kossove for his signature. Weiser read the second draft before it was returned to New York. Kossove testified that he looked at the lease but did not read it. Again Kossove and Liebowitz signed and acknowledged its execution in its redrafted form. The lease in triplicate was then returned to Judie by Weiser, whereupon it was signed by Judie and his wife. A copy was delivered to Weiser, who forwarded it to Kossove.

Following the execution of the lease and within four or five days, Kossove read it and for the first time discovered the alleged mistake. He telephoned to Weiser that there was no provision for taxes and insurance in the computation of the percentage in the lease. He instructed Weiser to see Judie, which he did. Judie stated that there was no error in the lease and refused to change it. He offered to cancel it, which offer Holly refused. Thereafter, Holly made repeated efforts to get Judie to agree to a change in the lease but he refused on the ground that the lease accurately stated the agreement of the parties. Other conversations and occurrences which took

place between the parties prior to the bringing of the instant suit we regard as immaterial at this point.

That the terms of the lease, especially those in controversy, were written in plain, certain and unambiguous language is not and cannot be doubted. And it is neither alleged nor claimed that a fiduciary relation existed between the parties or that there was any fraud practiced on the part of Judie. That the parties were dealing at arm's length is obvious. In one corner was Judie, an 81 year old man, representing himself, and in the opposite corner was Holly, represented by its officers and agents, all of whom were business men of long experience and at least four of whom were lawyers, and these five men were all presented with the opportunity and we think charged with the duty and responsibility of knowing the contents of the lease before Holly became a party.

It may be true, as asserted, that Holly's New York officials and attorneys were lulled into a position whereby they failed to discover the alleged mistake because of statements made to them by Weiser that he had checked the figures and found them correct. This may be the best excuse available for their failure to read and understand what was plainly written but it certainly affords no legal justification. Even if it did, Weiser, a trained and experienced business man who had conducted with Judie all the negotiations leading up to the execution of the lease, had every opportunity to read, know and understand its contents.

In this respect Weiser testified as follows:

"Q. Then what did you do with the lease? A. I put it in my brief-case and took it to New York.

"Q. Did you examine the lease? A. I read it on the plane.

"Q. Did you note the figure Five Hundred Forty-two Thousand Eight Hundred some odd dollars in the lease? A. Yes, I did.

"Q. Did you compute it? A. No, I didn't.

"Q. You believed— A. I believed it was right. I didn't know how to compute a figure of that type at that time.

"Q. That was a matter of capitalizing guaranteed rentals against percentage, is that correct? A. That is right.

"Q. To determine where the percentage on gross sales started? A. Yes.

"Q. You say you did not know at that time how to compute it? A. Yes.

"Q. Do you know now? A. Yes, sir."

Weiser also testified that he read the provisions that Holly should pay the taxes and insurance in addition to the rents to be paid to Judie and that he understood them because it was the agreement with Judie that "we were to assume these taxes and insurance." In an effort to excuse Weiser for his failure to know and comprehend what he read, there is injected the theory that some complicated and technical formula not understood by Weiser was mistakenly used by Judie in arriving at the figure of $542,857.14. This is another excuse apparently conceived for the purpose of this law suit, because a determination of the proper figure presented nothing more than a problem in simple arithmetic. To illustrate, if Weiser had the belief, which we doubt, that Holly was to have credit for $7,000 (taxes and insurance), in addition to the guaranteed rentals of $38,000, his problem in determining the proper base for a calculation of gross sales was $38,000 plus $7,000 equals $45,000. $45,000 divided by 7% equals $642,857.14, the figure which it is claimed should have been asserted in the lease. And he could have verified this figure thus: $642,857.14 multiplied by 7% equals $45,000. On the other hand, it was a matter equally simple of solution to determine that the figure contained in the lease was arrived at upon a basis of $38,000 and not $45,000, thus: $542,857.14 multiplied by 7% equals $38,000, or $38,000 divided by 7% equals $542,857.14.

That a mere reading of the lease was sufficient to discover the alleged error is demonstrated by the testimony of Kossove, who testified:

"Q. When did you discover the alleged error in this lease, Mr. Kossove? A.

When I received back the signed copy, signed by Mr. and Mrs. Judie.

"Q. Did you discover that error from your reading of the lease? A. I discovered that error from my reading of the lease."

It is at once apparent that Kossove could as readily have discovered the alleged mistake before execution of the lease as afterward if he had read it, and there is no reason to think but that a reading of the lease prior to the execution by any of the other numerous persons in whose possession it was, including Weiser, would have readily disclosed the alleged mistake.

Plaintiff thus finds itself empaneled on one prong or the other of a two-horned dilemma—either it did not read the lease, or if it did so no heed was given to its plain and unambiguous terms—and its position on one horn is no better than on the other. That its failure to know and understand the provisions of the lease which it solemnly executed was the result of its own inexcusable negligence is beyond the pale of reasonable argument.

There are many cases where courts of equity have denied relief to a party seeking reformation of a written instrument under such circumstances, and this includes the courts of Indiana as well as elsewhere. In Toops v. Snyder et al., 70 Ind. 554, 560, the court quoted from a Maryland chancery case as follows: " 'It is not, however, in every case of mistake, even of a material fact, that the court will grant relief, for if the mistake is the result of the party's carelessness or inattention, the court will not interfere in his behalf, its policy being to administer relief to the vigilant and to put all parties upon the exercise of a reasonable degree of diligence.' " The court then stated, "This may be regarded, we think, as the settled, equitable doctrine in reference to the correction of alleged mistakes."

In Robinson et al., v. Glass, 94 Ind. 211, 212, the court stated: "It is the law that one of sound mind must exercise prudence in making contracts, and if he neglects to exercise ordinary prudence, the courts will give him no relief. [Citing many Indiana cases.] * * * A man who can read and does not read an instrument which he signs is, as a general rule, guilty of negligence, and so he is, if, being unable to read, he neglects to exercise ordinary prudence in requiring the instrument to be read to him." The court then noted an exception to this general rule, as follows: "If any trick or artifice is resorted to which denies the person executing the instrument an opportunity of reading the instrument, or of having it read to him, the general rule does not operate."

In Habbe v. Viele, 148 Ind. 116, 125, 45 N.E. 783, 786, 47 N.E. 1, the court in reversing a decree for reformation stated: "Unless in case of the clearest evidence of inadvertence, relief should not be granted if the mistake is the result of the party's own negligence, or that of his attorney. 'Under this head,' says Mr. Bispham, in the work already cited (section 191), 'should be classed mistakes into which a party had fallen because he has not made use of the means of inquiry which were open to him; as, for instance, where he has not taken the trouble to read the paper which he was executing.' "

In Upton, Assignee v. Tribilcock, 91 U.S. 45, 50, 23 L.Ed. 203, the court in considering a controversy where it was sought to vary a written instrument stated: "It will not do for a man to enter into a contract, and, when called upon to respond to its obligations, to say that he did not read it when he signed it, or did not know what it contained. If this were permitted, contracts would not be worth the paper on which they are written. But such is not the law. A contractor must stand by the words of his contract; and, if he will not read what he signs, he alone is responsible for his omission."

In Hayes v. Travelers Ins. Co., 10 Cir., 93 F.2d 568, 125 A.L.R. 1053, the court reversed a decree for reformation of a written instrument, with instructions to dismiss the bill. The court, citing the Upton case, supra, and many other cases, stated, 93 F.2d at page 571: "One having the capacity and opportunity to read a contract, who executes it without reading it, in the absence of fraud or imposition, or special circumstances excusing his failure to read it, is charged with knowledge of its contents

and cannot avoid the contract by asserting that it did not express what he intended. [Citing many cases.]"

As to the duty of a person to read and understand a written instrument to which he has become a party, see recent decisions of this court, Vargas v. Esquire, Inc., 166 F.2d 651, 654, and Lawrence v. Muter Co. et al., 171 F.2d 380, 384.

[1] Thus, we are of the view that Holly had no standing in a court of equity to obtain reformation in the manner sought even though there was a mutual mistake, as found by the lower court, for the reason that any mistake on its part was the result of its own inexcusable negligence. While we think the decree could properly be reversed on this basis, we are hardly content to do so without further consideration of the evidence as it relates to the court's findings of fact and conclusions of law.

As a basis for reformation the court found:

"It was the mutual intent of the parties at the conclusion of their negotiations:
* * *

(2) That under the new lease Mr. Judie should realize for the entire property the same guaranteed annual rental that he had previously received as a guaranteed rental from the tenants in the building other than the plaintiff and from the plaintiff under the 1944 lease, less the amount which was then currently being paid for taxes and insurance and which the plaintiff agreed to assume. These guaranteed annual rentals would have totaled about $45,000.

(3) That Mr. Judie should receive as a maximum rental 7% of the gross sales realized by the plaintiff on the premises, but that in no event was he to receive less than $38,000 as a guaranteed annual rental.

(4) That the difference between the $38,-000 guaranteed rental and the approximate sum of $45,000 which Judie would have realized under the existing leases represented the estimated amount of taxes and insurance which was then being paid on the property.

(5) That the guaranteed rental of $38,-000 and this difference of $7,000 should be taken into account before excess rentals on the basis of 7% of gross sales should begin.

(6) That the new arrangements whereby the plaintiff was to pay the taxes and carry the insurance was not for the purpose of increasing the amount of the rents then being realized by the defendants from the entire building, but was for the purpose of relieving the defendants from all responsibility in connection with the care of the property and of requiring the plaintiff to pay as additional rental, the cost of the insurance and the taxes in excess of the $7,000 difference."

And further the court found that "a mutual mistake was made in providing that the plaintiff should pay 7% on its gross sales in excess of $542,857.14," that "To carry out the mutual intention of the parties * * * the lease should have provided that the plaintiff should pay 7% on its gross sales in excess of $642,857.14," and that "The parties were mutually careless in the preparation and execution of the formal lease * * *." The court concluded that Holly was entitled to reformation in accordance with such findings.

As to the character and degree of proof required to authorize the reformation of a written instrument, there seems to be no controversy, and the rule announced by the courts of Indiana is similar to that generally applied. In Board of Commissioners of Hamilton County v. Owens, 138 Ind. 183, 37 N.E. 602, the court quoted with approval and cited authority in support of a number of rules pertinent to a suit for reformation. Indiana authorities were cited in support of the rule, 138 Ind. at page 186, 37 N.E. at page 603, " 'To entitle a party to a decree of a court of equity reforming a written instrument, it must be shown that words were inserted that were agreed to be left out, or that words were omitted that were agreed to be inserted.' " And on the following page the court cites an Indiana case (Oiler v. Gard, 23 Ind. 217) for the rule that " 'Relief will be granted in cases of written instruments only when there is a plain mistake clearly made out by satisfac-

tory proofs. The rule forbids relief whenever the evidence is loose, equivocal, or contradictory, or is in its texture open to doubt or opposing presumptions.'" On the same page, the court quotes another Indiana authority (Linn v. Barkey, 7 Ind. 69) for the rule, "'To authorize a court of equity to reform a written instrument on the ground of mistake, it must be established beyond reasonable controversy, and be made entirely plain, that the instrument does not express the intent of the parties.'" The court further on the same page quotes from Pomeroy's Equity Jur., the rule, "'Courts of equity do not grant the high remedy of reformation upon a probability, nor even upon a mere preponderance of the evidence, but only upon a certainty of the error.'"

▮▮▮ A similar pronouncement was made in Citizens' National Bank of Attica v. Judy et al., 146 Ind. 322, 347, 43 N.E. 259, and in Habbe v. Viele, 148 Ind. 116, 122, 45 N.E. 783, 785, 47 N.E. 1, in which latter case the court in reversing a decree for reformation stated: "'Where the mistake has been on one side only, the utmost that the party desiring relief can obtain is rescission, not reformation.' And again, 'A person who seeks to rectify a deed on the ground of a mistake must establish, in the clearest and most satisfactory manner, that the alleged intention to which he desires it to be made conformable continued concurrently in the minds of all parties, down to the time of its execution.'"

Applying the rule thus stated, are the court's findings substantially supported by the record? If not, they must be deemed to be clearly erroneous and are not binding upon this court. As the findings disclose, the court determined the intent of the parties as "at the conclusion of their negotiations." Of course, as to the time element that was the critical period, but we suspect, although the record does not disclose, that the court considered certain oral testimony which we think was incompetent for the purpose of showing a pre-existing agreement. Kossove and Weiser were the only witnesses who testified on behalf of Holly, and it was only the latter who gave testimony as to negotiations with Judie previous to the execution of the lease. Weiser testified as to numerous conversations had with Judie concerning the leasing of the property. First, unknown to Holly, because of dissatisfaction with his employer, he attempted to lease for himself that part of the property then not under lease to Holly. Commencing about January 1, 1946, Weiser, then satisfied with his employment, commenced discussions with Judie concerning the possibility of Holly leasing the entire building. On May 13, 1946, Judie at Weiser's request wrote a letter setting forth the terms upon which he was willing to lease the entire building to Holly. Weiser admitted at the trial that the discussions had with Judie prior to May 13, 1946 were more or less informal and that they were not had with the idea of binding either party. Judie's letter of May 13, 1946, containing the terms and conditions upon which he proposed to lease the premises, was accepted by Holly in a telegram the following day. Thus, all oral communications between Weiser and Judie theretofore had merged in this written agreement, evidenced by Judie's proposal and Holly's acceptance, and it was this pre-existing agreement which was finally incorporated in the lease in suit. Therefore, we doubt if the oral testimony can properly be considered for any purpose and certainly not for the purpose of showing the pre-existing agreement of the parties.

Judie's letter of May 13, 1946 stated: "I think my statement to you was about as follows: I would lease the property to your company from January 1, 1947, to January 1, 1960, and would extend the time on your present storeroom (135-137 South Michigan Street) to January 1, 1960, cancelling old lease and writing new lease to cover the entire property for a guaranteed annual rental of $38,000.00 (together with 7% on sales), your company to assume the payment of all city, county, and state taxes, as well as street and sidewalk improvements (if any) and to carry fire and extended coverage insurance to the amount of at least 80% of the valuation of the buildings." To us, that proposal is not substan-

tially different from the corresponding provision contained in the lease. By it Judie was to receive 7% on sales, with a guaranteed annual rental of $38,000, and Holly was to assume the payment of taxes and insurance. And certainly there is nothing in the proposal which justifies the contention that both parties intended that the amount of taxes and insurance assumed and paid by Holly was to be added to the guaranteed rental before arriving at the amount of gross sales above and on which Judie was to receive 7%.

Holly lays much stress, however, upon another provision contained in Judie's letter, as follows:

"The way I arrive at the guaranteed rental of $38,000.00 per year is, as follows:

"Your lease beginning February 1, 1948 and expiring January 31, 1958 covering your present location (135-137 South Michigan St.) calls for a guaranteed rental of $24,000.00 per year, and we pay the taxes. In as much as 135-137 South Michigan Street is approximately two-thirds of the property, I assume that the tax is $4,000 on that part; so I credit $4,000 against the $24,000 which would leave a rental of $20,000 for 135-137 South Michigan Street in as much as you would pay the tax under terms of the proposed lease. On the corner property (137½-139 South Michigan Street) the guaranteed rental was $20,000.00; and crediting you with $2,000 for the payment of taxes, this would leave a balance of $18,000 as the guaranteed rental, thus making a total of $38,000.00 as the guaranteed annual rental for the entire property from February 1, 1948 to February 1, 1960."

We think this provision furnishes little if any support to Holly's contention. It had nothing to do with the amount of rentals to be received by Judie but was directed solely to the manner in which Judie arrived at the guaranteed rental of $38,000.

Moreover, the very fact that there is a controversy as to what was intended by Judie in his offer as contained in this letter when its terms were accepted by Holly is a strong indication that there was no meeting of the minds and, therefore, no mutual

mistake. In this connection it is also pertinent to note that Weiser testified that the letter was carefully read by him and mailed to Kossove. It may also be assumed, although the record does not show, that the proposal contained in this letter was read and understood by Kossove. Otherwise, he would not have so readily accepted its terms. As noted, it is not claimed that there was any meeting of the minds of the parties prior to this letter, and if there was no meeting of minds by reason of the proposal contained in the letter and its acceptance, there never was a pre-existing agreement upon which this suit for reformation could rest.

We therefore do not agree that there was any mistake on the part of Judie in the terms of the lease which he prepared. At any rate, the finding that a mutual mistake was made is not supported by such clear and convincing evidence as is required in a case of this character, and the absence of such proof is fatal to Holly's suit. In fact, Weiser's testimony strongly supports the conclusion that there was no mistake on the part of Judie. On cross-examination he testified as follows:

"Q. So far as the second draft of lease was concerned, so far as you knew it contained the agreement of the parties; is that right? A. That is right.

"Q. And you think today Mr. Judie drew that lease as he intended to draw it, don't you? A. Yes."

Holly, in order to show that a mistake was made on the part of Judie and in support of the court's finding in that respect, places much emphasis upon Judie's admission on cross-examination that the reason he asked Holly to assume the carrying charges was so that he might be rid of the entire responsibility in connection with the property, and that "it was not for the purpose of getting increased rents." He also was interrogated and answered as follows:

"Q. You never had any idea of getting more than 7%? A. No, not on the percentage."

Just what Judie meant by these statements is not clear; in fact, it is a matter

738

of controversy here. Holly contends that this testimony is inconsistent with the terms of the lease for the reason that if the taxes and insurance agreed to be paid by it are not taken into consideration in determining the amount of rentals to be received by Judie, in addition to the guaranteed rentals, the effect is to increase such rentals by the amount paid for taxes and insurance. On the other hand, it is asserted that Judie was referring only to the net rent actually received by him and that in making such answers he did not take into consideration the additional obligation of Holly to pay the taxes and insurance. It may be that his statements are capable of either interpretation, but in any event they afford little if any support for the premise that a mutual mistake was made.

A discussion of all the testimony would unduly prolong this opinion. While we have considered it all, we have attempted to relate only that which appears to bear on the more important phases of the case. We are satisfied that the proof is not of that certain and substantial nature which would authorize a court of equity to allow the relief sought.

Judie also complains of the court's failure to award him attorney fees and expenses, as requested in a counterclaim. The lease provides for such expenses incurred by the lessor in enforcing the covenants and agreements of the lease. Whether such provision is applicable to the instant situation may be open to question. The court, of course, was justified in denying such relief in view of its holding that Holly was entitled to reformation. Under such circumstances, we doubt if either the court or the parties gave any serious consideration to the relief sought by the counterclaim. In view of our decision, the court below will be confronted with a different situation and, without expressing any opinion as to the merit of Judie's counterclaim, we leave the question thereby presented open for further consideration by the court below.

The decree appealed from is reversed and the cause remanded, with directions that it be vacated and that the complaint be dismissed for lack of equity.